519 F.2d 974
 Fed. Sec. L. Rep. P 95,080
Howard BERSCH, Plaintiff-Appellee-Appellant,
v.
DREXEL FIRESTONE, INCORPORATED, et al., Defendants,
Arthur Andersen & Co., I.O.S., Ltd., and Bernard Cornfeld,
Defendants-Appellants,
J. H. Crang & Co., Defendant-Appellee.
 Nos. 783, 784, 795 and 822, Dockets 75-7038, 75-7055,
75-7057 and 75-7031.
 United States Court of Appeals,
Second Circuit.
 Argued March 6, 1975.
Decided April 28, 1975.
 
 Sidney B. Silverman, New York City (Silverman & Harnes, New York City, of counsel), for Howard Bersch, plaintiff-appellee-appellant.
 Edward J. Ross, New York City (James D. Zirin and Breed, Abbott & Morgan, New York City, and Charles W. Boand and Wilson & McIlvaine, Chicago, Ill., of counsel), for defendant-appellant Arthur Andersen & Co.
 Bernard Mindich, New York City (Michael W. Schwartz, and Wachtell, Lipton, Rosen & Katz, New York City, of counsel), for defendant-appellant I.O.S., Ltd.
 Leonard M. Marks, New York City (Martin R. Gold, Charles B. Ortner and Gold, Farrell & Marks, New York City, of counsel), for defendant-appellant Bernard Cornfeld.
 Howard C. Buschman, III, New York City (Anthony F. Phillips, Paula J. Mueller and Willkie Farr & Gallagher, New York City, of counsel), for defendant-appellee J. H. Crang & Co.
 Before FRIENDLY, MULLIGAN and TIMBERS, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 These appeals from orders of Judge Carter in an action in the District Court for the Southern District of New York again bring before us the question of the territorial reach of the federal securities laws with which we have previously dealt in Schoenbaum v. Firstbrook, 405 F.2d 200 (2 Cir.), rev'd on the merits, 405 F.2d 215 (2 Cir. 1968) (en banc), cert. denied sub nom., Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), and Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (2 Cir. 1972). Apart from differences in the facts, there is the added complexity that whereas Schoenbaum was a derivative action by stockholders of a Canadian corporation and Leasco an action by two corporate plaintiffs,[1] the suit here is a class action on behalf of thousands of plaintiffs[2] preponderantly citizens and residents of Canada, Australia, England, France, Germany, Switzerland, and many other countries in Europe, Asia, Africa, and South America.
 
 
 2
 I. The Basic Facts.
 
 
 3
 The securities transactions giving rise to this litigation go back to 1969. The securities were the common stock of defendant I.O.S., Ltd. (IOS), an international sales and financial service organization principally engaged in the sale and management of mutual funds and complementary financial activities organized under the laws of Canada,[3] having had its main business office in Geneva, Switzerland. It is now in the hands of liquidators appointed in November, 1973, by the Supreme Court of New Brunswick pursuant to the Canadian Winding-Up Act, Revised Statutes of Canada, 1970, ch. W-10.[4]
 
 
 4
 Prior to 1968 the stock of IOS and its subsidiaries had been held by its organizer, defendant Bernard Cornfeld, his associates, and their employees. Although Cornfeld had always been free to sell his IOS shares, and in fact had disposed of significant amounts of these over the prior nine year period, his employees had been denied the right to sell their holdings and no organized market for IOS shares existed. Within the company the price of the stock was set by a theoretical formula value; the stock was used as a means of partial compensation and was granted to employees as a performance incentive, it being commonly understood by the employees that the company would eventually be taken public and they might then "cash in".[5] A plan was developed wherein each of IOS's principal subsidiaries would first separately be taken public; finally common shares of IOS itself would be sold. In 1968 IOS floated 600,000 shares of one of its principal subsidiaries, IOS Management Ltd., a Canadian registered concern. The shares were offered at $12.50; trading opened at $75; and by March 1969 they had reached a peak of around $180. Subsequent to this sale, no doubt in part due to the success of this offering and more importantly to growing salesman dissatisfaction in light of a successful offering by a recently created competitor,[6] the decision was made to abandon the original plan and to take IOS public as soon as appeared feasible. The planning of this offering was constrained by the framework set out in an Order Accepting Offer of Settlement entered by the SEC on May 23, 1967. Paragraph 4 of this order provided in pertinent part:[7]
 
 
 5
 Upon entry of the Order based on this Stipulation, IOS and all its affiliates shall cease all sales of securities to United States citizens or nationals wherever located, except for (i) offers and sales outside of the United States (and its territories, possessions or commonwealth subject to the jurisdiction of the United States) to officers, directors and full-time personnel of IOS and its subsidiaries. . . .
 
 
 6
 Three separate distributions of IOS common stock were proposed. The largest was to be a primary offering of 5,600,000 newly issued shares underwritten by six of the defendants (hereafter the Drexel group) two American banking houses, Drexel Firestone, Inc.[8] and Smith, Barney & Co., having their principal offices in the United States but also having offices in Europe, and four foreign underwriting houses, Banque Rothschild; Hill Samuel & Co. Limited; Guinness Mahon & Co. Limited; and Pierson Heldring & Pierson, having their principal offices abroad.[9] The 5,600,000 shares were to be and were in fact sold under a prospectus outside the United States to foreign nationals residing in Europe, Asia and Australia. Prospectuses were printed abroad in English, French, and German and delivered to the purchasers outside the United States. A secondary offering of 1,450,000 shares, underwritten by defendant J. H. Crang & Co., a Toronto investment house (Crang),[10] was made in Canada by a prospectus conforming to the laws of Canada and its provinces; all of these shares were sold in Canada and none was sold to Americans resident there.[11] The third distribution, whence this action springs, was a secondary offering of 3,950,000 shares by defendant Investors Overseas Bank Limited of Nassau, the Bahamas, an IOS subsidiary (IOB). The prospectus stated, as had that of the Drexel Group, that the shares "are not being offered in the United States of America or any of its territories or possessions or any area subject to its jurisdiction" and was "being made to approximately 25,000 persons who are either (1) employees or sales associates of the Company, (2) certain clients presently holding investments in managed funds or other products of the Company, or (3) persons who have had a long-standing professional or business relationship with the Company."
 
 
 7
 The offerings were made at the same price, $10 per share, and at approximately the same time. Each prospectus referred to the two other offerings. Reference was made to plans to list the IOS stock on various stock exchanges, none of these being in the United States. The Drexel Group and IOB prospectuses were substantially identical. Although the Crang prospectus was somewhat different insofar as compliance with particular Canadian securities regulations was sought, all three contained balance sheets of IOS and various subsidiaries as of December 31, 1968, and income statements for the five years then ended, and a report of defendant Arthur Andersen & Co. (Andersen), an international accounting firm with its principal office in the United States, that, subject to usual qualifications, the statements fairly presented the financial condition of the company as of December 31, 1968, and for the five years then ended. The Drexel and IOB prospectuses stated that the offerings had not been registered under United States securities laws.[12] The offerings were successful in the limited sense of being fully subscribed, but after stabilizing briefly at $14 the price of the shares drifted downward until April 1970 when it collapsed through the $10 level and three weeks later the shares apparently were virtually unsaleable. The plight of the purchasers was further aggravated when control of IOS passed into the hands of Robert L. Vesco, currently a resident of Costa Rica, and a defendant in a substantial number of actions for fraud pending in this circuit.
 
 
 8
 II. The Proceedings in the District Court and this Court.
 
 
 9
 The complaint in this action alleging violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, and also containing allegations which can be read as charging common law fraud, was filed in December 1971 by Howard Bersch, a United States citizen living in New York, who had purchased 600 shares of IOS common distributed as part of the IOB underwriting.[13] Characterizing the three underwritings as the "IOS Public Offering", Bersch alleged he was bringing the action individually and on behalf of all persons who purchased stock in each of the offerings, estimated to approximate 100,000.[14] The complaint contained the allegations usual when a plaintiff desires designation of his action as a class action under Fed.R.Civ.P. 23(b)(3). It alleged that the underwriters "impliedly represented to the public that IOS was a suitable company for public ownership" when, in part as a result of the refusal of other investment houses to participate, they should have known that it was not. It also contained more particularized charges, e. g., that the prospectuses failed to reveal illegal activities by IOS and its officers which had seriously damaged the company,[15] that the books and records of IOS and its subsidiaries and affiliates were in such a chaotic condition that it was impossible to determine from them an accurate picture of IOS's financial position, and that during the months preceding the offering various IOS officials, including Cornfeld, had touted IOS' prospects. It charged that the underwriters in the Drexel Group had failed to use due diligence with regard to their prospectus, and that Andersen had failed to observe generally accepted accounting principles in connection with its audit with the result that the financial statements were false and misleading in various respects unnecessary to detail here.
 
 
 10
 The first clash between the parties arose on a motion by plaintiff for class action determination. The defendants who had been served[16] filed opposing affidavits and memoranda which raised the question of the propriety of the inclusion of foreign purchasers in the class but did not ask that the complaint be dismissed. On June 28, 1972 Judge Frankel ruled in a short memorandum. Recognizing that "(t)he submissions on this motion are substantial and interesting," he thought that the incomplete record before him precluded ultimate decision. Any attempt at this was even more undesirable because of the impending change in the Southern District's calendar plan whereby the case would be assigned for all purposes to a single judge, probably not himself. After this prelude, he announced the following conclusions:
 
 
 11
 (1) It is not possible (or desirable) to say now with confidence whether the transactions plaintiff assails are reachable under either or both the 1933 and 1934 Acts. Defendants obviously took pains to structure their activities to avoid the reach of American securities laws. Whether they succeeded is a question that will probably merit extensive discovery. . . . Whatever final decision may be reached on the applicability of the American securities laws, plaintiff has adduced enough to allow the case to proceed for the time being as a class action.
 
 
 12
 (2) Plaintiff has also made a case sufficient for present purposes that there are predominant common questions of law and fact justifying a class action under Rule 23(b)(3). . . . It is feasible to leave for later determination, upon a fuller record, the question whether foreign purchasers will be entitled to invoke the protections and sanctions of American securities laws. For the present at least, all purchasers may be represented as a single class by the evidently energetic, competent and motivated team of counsel for the named plaintiff.
 
 
 13
 (3) Defendants(') . . . question as to whether foreign investors, whatever actual or constructive notice they receive, will be bound in their own courts by an adverse decision in the instant class action (is serious).
 
 
 14
 (4) (In view of) the substantial change in the procedures of this court (each civil case is to be assigned for all purposes to the same judge) basic questions affecting the management of the case (such as) (t)he keystone . . . matter of notice under subdivision (c)(2) of Rule 23 . . . should be, and will be, left for the judge in charge of it.
 
 The memorandum concluded:
 
 15
 The single question now resolved (and this, too, is of course open for reexamination under Rule 23(c)(1)) is as to the suitability of allowing the case to proceed as a class action. Plaintiff's motion in this respect is granted. The action may be maintained as a class action on behalf of all purchasers of IOS shares in the 'IOS Public Offering,' as detailed in the complaint, of 10,992,000 shares beginning in September 1969.[17]
 
 
 16
 On December 27, 1972, the Drexel Group entered into a consent order with plaintiff Bersch, in which it was agreed that plaintiff would initially limit his discovery to the issues that Judge Ryan considered to have been left open by Judge Frankel,[18] at the completion of which the defendants might make jurisdictional and class action motions within sixty days. After plaintiff had had extensive discovery, particularly directed at the extent of the activities of the defendants within the United States, the defendants, in the fall of 1973, moved to dismiss the complaint for lack of subject matter jurisdiction and, in some cases, lack of jurisdiction over the person; several of the motions also requested that Judge Frankel's class action determination be either vacated or modified to exclude foreign purchasers. While these motions were pending before Judge Carter, to whom the case had been assigned, the members of the Drexel Group, on June 8, 1974, entered into a stipulation of settlement. As against the original claim of some $110,000,000, plus interest from September, 1969, this provided for a payment of $700,000. The settlement was conditioned upon the entry of a final judgment approving it as regards the settling defendants; reserving all rights of plaintiff against non-settling defendants; and providing that the settling defendants should receive out of any recovery against the non-settling defendants the amount of any liability arising from cross-claims and their expenses in defending against these and in assisting in the prosecution of this action. It was conditioned also on the dismissal with prejudice and on the merits of any other action brought in any court arising out of any of the events described in the complaint. The settling defendants might withdraw from the settlement if members of the plaintiff class holding more than 300,000 IOS shares should opt out. On December 4, 1974, Judge Carter entered an order setting a hearing on the proposed settlement for March 21, 1975. The settling defendants were to mail notices of the hearing in a form annexed to the order[19] to each purchaser from them, were to request each underwriter or dealer known to have participated in any of the three underwritings to mail similar notice to purchasers from them and furnish an adequate number of copies and postage, and to cause notice to be published in The New York Times, the Paris Herald Tribune, the Montreal Gazette, and the Toronto Globe and Mail. The notice included an indication that plaintiff's counsel intended to apply for a fee in the amount of $200,000 and reimbursement of expenses then in the amount of some $10,000.
 
 
 17
 The district court had been kept advised of the progress toward settlement and there had been conferences concerning the relation between the settlement and the ruling on the pending motions to dismiss. Pursuant to an agreement on procedure at a conference on July 15, 1974, the parties were notified by telephone on July 29 that the court had concluded it had subject matter jurisdiction and was preparing an opinion to that effect. At a further conference on July 31, the non-settling defendants requested that the court in its opinion certify the issue of subject matter jurisdiction for an interlocutory appeal under 28 U.S.C. § 1292(b).
 
 
 18
 The district court rendered its opinion on November 26, 1974. The first question it addressed was whether the 1969 IOS Public Offering fairly could be viewed as one, two, or three distinct offerings. Depending upon whether one focused "on the purposes of the offering and the interaction of its prime movers, upon the character of the offerings themselves, or upon the structure of the selling arrangement and the identity and locus of the purchasers," each of these views was considered at least arguable. The court concluded that the three offerings were sufficiently integrated that they should be considered as one for the purpose of determining subject matter jurisdiction. It then found subject matter jurisdiction because of three factors:
 
 
 19
 (1) The amount of activity in the United States, almost entirely in connection with the Drexel offering, by the underwriters, their counsel and accountants (Price Waterhouse & Co.), and IOS.
 
 
 20
 (2) Sales to Americans, estimated at 386 individuals, even though "the defendants appear to have made an attempt to prevent any sales to Americans" and none occurred through the Drexel Group or Crang offerings.
 
 
 21
 (3) Generally adverse effects upon the American securities markets from the collapse in the price of the IOS shares offered.
 
 
 22
 The court rejected contentions of Crang and Smith Barney & Co. that they were exempt from liability under the 1934 Act by virtue of § 30(b).[20] Turning to in personam jurisdiction it sustained the contention of Crang that it was not subject to the jurisdiction of the district court but rejected that of IOS.[21] It likewise rejected contentions of IOS and Cornfeld with respect to the method of services of process, as well as of undue delay in effecting service.[22] It also denied an application of IOS for a stay of proceedings against it on the ground that comity required any claims to be determined in the New Brunswick liquidation. The court certified its ruling with respect to subject matter jurisdiction for an interlocutory appeal under 28 U.S.C. § 1292(b) and affixed a Rule 54(b) certificate to its order dismissing against Crang for lack of jurisdiction over the person. However, it declined to grant a § 1292(b) certificate with respect to its various unfavorable rulings as to IOS and Cornfeld which we have just described.
 
 
 23
 On December 17 Andersen and Cornfeld moved this court to stay the mailing and publication of the notice of the proposed settlement on the ground that the district court had no subject matter jurisdiction and that publicizing of the settlement would stir up litigation against them. We granted a stay on December 19 pending consideration of the motions for leave to appeal under § 1292(b) by Andersen, IOS and Cornfeld, which were being held by the clerk to await opposing papers, and if such motions were granted, for such further period as should then be provided. Subsequently we granted the motions for leave to appeal under § 1292(b), consolidated the three appeals, set an expedited schedule, and extended the stay pending argument of the appeals and such further period, if any, as might then be determined.[23] Later we also consolidated plaintiff's appeal from the order dismissing the complaint against Crang for want of jurisdiction over the person.
 
 
 24
 III. Subject Matter Jurisdiction in General.
 
 
 25
 Appellants vigorously attack the district court's "integration" of the three offerings. They say that the SEC has employed this concept only to prevent evasion of rules exempting from registration offerings of a certain amount or less as in Regulation A, 17 C.F.R. § 230.254, or to no more than a specified number of purchasers, as in SEC Rule 144, 17 C.F.R. § 230.144, but not in a situation like that here presented. They argue that once the integration theory is rejected, there is no subject matter jurisdiction over purchasers in the Drexel offering, in which there was certain United States activity, since there were no American purchasers, no subject matter jurisdiction with respect even to the American purchasers in the IOB offering since defendants engaged in no activities in the United States with respect to that offering, and no subject matter jurisdiction as to the Crang offering since there were neither United States activities nor American purchasers. Plaintiff responds that all this is simply playing on the judge's use of the word "integration", and that what he meant and indeed said was that, for purposes of determining subject matter jurisdiction, the three offerings were sufficiently intertwined that it is unrealistic to fractionate them. For reasons that will appear in the course of our discussion, we do not believe this point to be quite so vital as the parties do. We shall deal with it when its relevance appears.
 
 
 26
 A few preliminary observations will be helpful. We have no doubt that the activities within the United States, detailed in the judge's thorough factual findings,[24] were sufficient to authorize the United States to impose a rule with respect to consequences flowing from them wherever they might appear, under the principle stated in Restatement (2d) of the Foreign Relations Law of the United States § 17, "Jurisdiction to Prescribe with Respect to Conduct, Thing, Status, or Other Interest within Territory" (1965),[25] quite apart from the power of the United States to impose rules on the conduct of its nationals, id. § 30, and see Steele v. Bulova Watch Co., Inc.,344 U.S. 280, 282, 73 S.Ct. 252, 97 L.Ed. 252 (1952). But, as we said in Leasco, supra, 468 F.2d at 1334, "it would be . . . erroneous to assume that the legislature always means to go to the full extent permitted." When, as here, a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries.
 
 
 27
 The second observation is that, despite the vigorous but opposing contentions of the parties, neither Schoenbaum nor Leasco is decisive. It is true that the precise grounds on which jurisdiction was upheld in those cases are not present here. In Schoenbaum an issue of stock to insiders of a Canadian company in Canada, allegedly at an unfairly low price, adversely affected the value and the price of its shares listed on the American Stock Exchange, some of which were held by resident American citizens, including the plaintiff; in Leasco a series of alleged misrepresentations with respect to an English corporation were made in the United States to officers of a publicly held American corporation that was being induced to purchase its stock even though other misrepresentations were made in England and the purchase of the shares of the English corporation was effected there. Plaintiff has not brought himself within the ambit of either case; moreover, neither Schoenbaum nor Leasco raised the serious problem here presented of the dubious binding effect of a defendants' judgment (or a possibly inadequate plaintiff's judgment) on absent foreign plaintiffs or the propriety of purporting to bind such plaintiffs by a settlement.[26] However, the absence of certain of the elements which led to finding subject matter jurisdiction in those cases does not necessarily preclude a similar conclusion on the different facts presented here. See Travis v. Anthes Imperial Ltd., 473 F.2d 515, 523-24 n.14 (8 Cir. 1973).
 
 
 28
 Thirdly, the SEC's disclaimer of the applicability of the registration requirements of the 1933 Act, see footnote 12 supra, to public offerings even of the securities of American corporations outside the United States, wherever the offerings may have originated, "so long as the offering is made under circumstances reasonably designed to preclude distribution or redistribution of the securities within or to nationals of the United States," greatly emphasized by appellant Andersen, has only a peripheral bearing. While counsel for the underwriters could justifiably have relied on this policy statement in advising that registration was not here required,[27] they could not have relied on it to advise their clients that the latter were free to engage in fraud, and there is, of course, no suggestion that they did.[28] It is elementary that the anti-fraud provisions of the federal securities laws apply to many transactions which are neither within the registration requirements nor on organized American markets. See Leasco, supra, 468 F.2d at 1335-37.
 
 
 29
 With this background we turn to the three elements a combination of which led the district judge to conclude that subject matter jurisdiction existed with respect not only to the relatively few Americans who had purchased IOS shares but to the many thousands of foreign purchasers whom plaintiff sought to represent. We think it will be useful to consider the first and third elements on which the court relied before we take up the second.
 
 
 30
 Assuming that there were no American purchasers and that the underwriting related, for example, to a large foreign industrial company clearly identified with a foreign country rather than with the United States, e. g., Rolls-Royce, Mercedes-Benz or Fiat, we do not believe the activities in the United States, see note 24 supra, would justify an American court in taking jurisdiction in a suit for damages by foreign plaintiffs. The fraud, if there was one, was committed by placing the allegedly false and misleading prospectus in the purchasers' hands. Here the final prospectus emanated from a foreign source London or Brussels in the case of the Drexel offering, Toronto in the case of the Crang offering, and apparently the Bahamas and Geneva in the case of the IOB offering. Not only do we not have the case where all the misrepresentations were communicated in the nation whose law is sought to be applied as in Illustration 2 of § 17 of the Restatement (2d) of Foreign Relations Law at 45, see Leasco, 468 F.2d at 1334 n.3, or the case where a substantial part of them were, as in Leasco itself, but we do not even have the oft-cited case of the shooting of a bullet across a state line where the state of the shooting as well as of the state of the hitting may have an interest in imposing its law. At most the acts in the United States helped to make the gun whence the bullet was fired from places abroad; alternatively proper action in the United States would have prevented the gun's ever being sent abroad. We are indeed holding in IIT v. Vencap, Ltd., --- F.2d --- (2 Cir. 1975) decided this day, that Congress did not mean the United States to be used as a base for fraudulent securities schemes even when the victims are foreigners, at least in the context of suits by the SEC or by named foreign plaintiffs. But as we there point out, that holding itself goes beyond any case yet decided,[29] and we see no reason to extend it to cases where the United States activities are merely preparatory or take the form of culpable nonfeasance and are relatively small in comparison to those abroad. We thus conclude that the action and inaction which here occurred in the United States would not of itself confer subject matter jurisdiction with respect to foreign plaintiffs even if we assume arguendo that the three underwritings may be considered for this purpose as one.
 
 
 31
 We turn next to the third ground on which the district court predicated subject matter jurisdiction the adverse general effect of the collapse of IOS in the United States. This was based on an affidavit by Morris Mendelson, Associate Professor of Finance at the Wharton School of the University of Pennsylvania. Professor Mendelson's principal conclusions were that:
 
 
 32
 (1) The aftermath of the Drexel offering "was a debacle of monumental proportions which resulted in a deterioration of investor confidence in American underwriters at home and, particularly, abroad," and increased the problems of United States corporations in seeking to raise capital abroad.
 
 
 33
 (2) "The false and misleading prospectus issued in connection with the Public Offering impaired investors' confidence and trust and contributed to a steep decline in the purchase of United States securities by foreigners" with attendant adverse effects on the balance of payments and the price of American securities generally.
 
 
 34
 (3) Loss of investor confidence in IOS led to large redemption of shares in the mutual funds controlled by it, notably Fund of Funds Limited, which required the funds to sell substantial parts of their portfolios, mainly United States securities, with consequent depression of prices.
 
 
 35
 (4) Part of the attraction of American securities to foreigners has been the superior disclosures afforded by SEC registration requirements. The collapse of IOS after the offering undermined this confidence since IOS was "identified as an American company in the minds of investors", the Drexel underwriting was led by an American firm and the accountants, Andersen, were American.
 
 
 36
 (5) The collapse of IOS after the offering "contributed to a breakdown in the entire structure of building up an offshore investing industry whereby funds of European investors were channeled into American securities markets."
 
 
 37
 Although appellants attack certain of Professor Mendelson's conclusions as erroneous or exaggerated,[30] we do not doubt that the collapse of IOS after the offering had an unfortunate financial effect in the United States. Nevertheless we conclude that the generalized effects described by Professor Mendelson would not be sufficient to confer subject matter jurisdiction over a damage suit by a foreigner under the anti-fraud provisions of the securities laws.[31]
 
 
 38
 This branch of plaintiff's arguments goes back to Mr. Justice Holmes' statement in Strassheim v. Daily, 221 U.S. 280, 284-85, 31 S.Ct. 558, 55 L.Ed. 735 (1911), which was relied on by Judge L. Hand in United States v. Aluminum Co. of America, 148 F.2d 416, 443 (2 Cir. 1945),[32] and by Chief Judge Lumbard in Schoenbaum, supra, 405 F.2d at 206:
 
 
 39
 Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power.
 
 
 40
 See Restatement (2d) of Foreign Relations Law § 18, "Jurisdiction to Prescribe with Respect to Effect within Territory". The statement, however, must be read in context. The indictment at issue in Strassheim v. Daily charged that Daily, in Illinois, had connived with the warden of a Michigan prison to defraud the prison's Board of Control by substituting worn and second-hand machinery for the new machinery that had been ordered, and the Court declined to upset, on a petition for habeas corpus, an order extraditing Daily from Illinois to Michigan. This principle would support subject matter jurisdiction if a defendant, even though acting solely abroad, had defrauded investors in the United States by mailing false prospectuses into this country, see ALI Proposed Federal Securities Code (Draft No. 3, April, 1974) § 1604(a) (1)(A) & Comment (3)(b) at 165-66, or if, as in Schoenbaum, the number of shares of a company traded on American exchanges was increased by a sale to insiders without adequate consideration at least when this is imperfectly disclosed, cf. Popkin v. Bishop, 464 F.2d 714 (2 Cir. 1972). But it does not support subject matter jurisdiction if there was no intention that the securities should be offered to anyone in the United States, simply because in the long run there was an adverse effect on this country's general economic interests or on American security prices. Moderation is all. This, we think, is what Judge Hand had in mind in the remarks in his Aluminum opinion quoted in the margin.[33] These considerations are particularly pertinent in view of the limitations in § 17(a) of the 1933 Act to acts in "the offer or sale of any securities" and in § 10(b) of the 1934 Act to acts "in connection with the purchase or sale of any security." This means to us that there is subject matter jurisdiction of fraudulent acts relating to securities which are committed abroad only when these result in injury to purchasers or sellers of those securities[34] in whom the United States has an interest, not where acts simply have an adverse affect on the American economy or American investors generally.[35] Also we do not think that a combination of the district court's first and third grounds, neither sufficient in itself, supports a result different from that which would be proper if each subsisted alone.
 
 
 41
 IV. Subject Matter Jurisdiction Americans.
 
 
 42
 We find it rather strange that this large record, with appendices alone running to more than 1200 pages, leaves us in serious doubt about one simple fact that seemingly could have been established quite readily. That is how plaintiff Bersch came to buy 600 shares of IOS that were part of the 3,950,000 share IOB offering.
 
 
 43
 Bersch was Vice-President and Secretary of Saja Associates Ltd., a privately-held business management and consulting firm, whose principal client was IOS, having an office in a building on Madison Avenue in New York City. His subscription was made on a form headed
 
 
 44
 Public offering subscription form for Common Shares of I.O.S., Ltd.
 
 
 45
 We assume this emanated from Geneva. In a box bearing the legend
 
 
 46
 Maximum dollar amount which may be subscribed: US $
 
 
 47
 someone had typed "6,000.00"; after the words
 
 
 48
 Please fill in this form and return the original copy with your remittance, in the envelope supplied, to
 
 
 49
 someone had typed[36]
 
 Juanita C. Torres
 119 Rue de Lausanne Geneva
 
 50
 Bersch filled some other blanks, including one which indicated that he was a United States citizen and signed his name and date 9/3/69, which was three weeks before the date of the offerings and the final form of the prospectus. Bersch stated in answer to an interrogatory:
 
 
 51
 As an officer and employee of Saja, I was told that if and when IOS went public, I would have the right to subscribe to 600 shares at the public offering price. I was informed, prior to purchase, that a telephone call had been received approving the allotment to me of 600 shares. The telephone call was made to Saja's office in New York: I was there at the time. I do not recall whether I was told the name of the person who telephoned, but in any event I do not recall his name.
 
 
 52
 It is unclear when or by whom the statement referred to in the first sentence was made; it could have been made before the offerings were even planned, perhaps as an inducement for him to join Saja. Also this leaves uncertain whether the insertion of the 6,000.00 and the name of Ms. Torres was done in Geneva on a form transmitted to New York or by someone in New York on one of a number of forms previously received from Geneva.[37] With respect to the offering prospectuses Bersch stated in answer to an interrogatory that Saja's office had copies of all three prospectuses, one of which "may" have been mailed to him at his office, that none were mailed to his home,[38] and that he read all three prior to "completing (his) purchase." However, this tells nothing whatsoever about how two or perhaps all three of the prospectuses got to Saja's office, what led Bersch to read them, or when he did this in relation to his subscription.[39]
 
 
 53
 If the record is thus murky on how Bersch came to subscribe, it is even murkier about how other American residents did. Appellant Andersen repeatedly says that the only information on this is a statement in an affidavit of Bersch:
 
 
 54
 I was not the only American residing here who purchased IOS stock. . . . Among the New Yorkers purchasing the IOS securities were: Christine Cullen, Naydyne Nelson, Claire Pipolo, David Ellner, Elliott Adler, Robin Leach, Robert Sutner, Raymond Grant, Simme Arthur, Hyman Feld, and Morton Schiowitz.
 
 
 55
 But this is simply not so. Much more information is furnished in a series of letters from IOS to the SEC in the fall of 1970. These indicate that sales aggregating 41,936 shares were made to 22 American residents, all having relationships with IOS or its affiliates as employees, lawyers, directors or consultants. Although Andersen loudly claims that Bersch and other American residents bought the shares when they knew they should not have, we find nothing in the record to support this. The IOB prospectus does not exclude American employees residing in the United States and, as indicated above, see note 7 and accompanying text, the SEC 1967 order does not clearly do so. We note also that several of the subscribers were members of law firms that had represented IOS or its affiliates; it is scarcely to be thought that they would have subscribed for shares which they knew were not intended to and could not lawfully be made available to them.
 
 
 56
 We see no reason why there would not be subject matter jurisdiction with respect to such persons on the part of defendants IOS and Cornfeld who were responsible for the IOB offering. This type of situation the dispatch from abroad of misleading statements to United States residents would be closely analogous to that in which jurisdiction was upheld in Strassheim v. Daily, supra, and in the Aluminum case and one which would be considered an appropriate subject of United States jurisdiction under § 18 of the Restatement (2d). To be sure, it may turn out that particular individuals never saw the statements or, because of their knowledge, were not misled.[40] But at the present stage we must assume that there was some mailing of prospectuses into the United States and some reliance on them. The same result should also follow with respect to Andersen; action in the United States is not necessary when subject matter jurisdiction is predicated on a direct effect here and Andersen allowed its report on the 1968 financial statements to be used in the IOB offering as much as in the two others. Subject matter jurisdiction with respect to the Drexel Group defendants is more debatable; this depends on whether their activities, whether in the United States or abroad, can be considered as essential to the carrying out of the IOB offering and thus of the purchases here at issue.[41] On the material before the district judge we think they can properly be, although this would be open to disproof at a trial. Cf. Leasco, 468 F.2d at 1330. Whether the same is true with respect to Crang is more debatable since the IOB offering was far more dependent on the large Drexel offering throughout the world than on the much smaller Canadian offering by Crang, but in view of our approval of the court's holding of lack of in personam jurisdiction over Crang, we need not decide this.
 
 
 57
 Plaintiff asserts that, in addition to purchases by Americans resident in the United States, there were significant purchases by Americans resident abroad.[42] Whether Congress intended that such persons should be entitled to obtain damages for violation of the securities laws is a different and closer question from that on which we have just ruled. We think the answer would be in the negative if none of the defendants engaged in significant activities within the United States, as defendants, with apparent soundness, claim to be the case with respect to the IOB offering considered alone. Congress surely did not mean the securities laws to protect the many thousands of Americans residing in foreign countries against securities frauds by foreigners acting there, and we see no sufficient reason to believe it would have intended otherwise simply because an American participated so long as he had done nothing in the United States. However, in Judge Carter's view the IOB offer to American citizens residing abroad would not have occurred but for the primary offering which involved the many documented activities of most of the defendants in the United States.[43] There was enough basis for this to justify a holding of subject matter jurisdiction as regards American citizens residing abroad, with respect to IOS and Andersen. Despite the paucity of physical acts on its part in the United States, the head and front of its alleged offending was its decision to allow its 1968 report to be used in all three prospectuses, including the IOB prospectus, and this must have emanated from its headquarters in the United States. We are of the same view with respect to the Drexel group. While merely preparatory activities in the United States are not enough to trigger application of the securities laws for injury to foreigners located abroad, they are sufficient when the injury is to Americans so resident. We here assume that, for reasons stated in the preceding paragraph, and in footnote 43, proof will disclose a significant causal relationship between the Drexel offering and the IOB offering. The case with respect to Crang is weaker but, since we sustain the judge's ruling of lack of in personam jurisdiction, we need not reach it. This leaves Cornfeld; the question of how far the alleged defrauding of American citizens abroad resulted from acts which he did or caused in the United States had best be left for development at a trial. We again invite attention to our observation in Leasco:
 
 
 58
 We add that if a trial should disclose that the allegedly fraudulent acts of any of the defendants within the United States were non-existent or so minimal as not to be material, the principles announced in this opinion should be applied to the proven facts; the issue of subject matter jurisdiction persists.
 
 
 59
 468 F.2d at 1330.
 
 
 60
 We have thus concluded that the anti-fraud provisions of the federal securities laws:
 
 
 61
 (1) Apply to losses from sales of securities to Americans resident in the United States whether or not acts (or culpable failures to act) of material importance occurred in this country; and
 
 
 62
 (2) Apply to losses from sales of securities to Americans resident abroad if, but only if, acts (or culpable failures to act) of material importance in the United States have significantly contributed thereto; but
 
 
 63
 (3) Do not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses.
 
 
 64
 Other fact situations, such as losses to foreigners from sales to them within the United States, are not before us. We freely acknowledge that if we were asked to point to language in the statutes, or even in the legislative history, that compelled these conclusions, we would be unable to respond. The Congress that passed these extraordinary pieces of legislation in the midst of the depression could hardly have been expected to foresee the development of off-shore funds thirty years later. We recognize also that reasonable men might conclude that the coverage was greater, or less, than has been outlined in this opinion and in ITT v. Vencap, Ltd., 519 F.2d 1001 (2 Cir. 1975) this day decided. Our conclusions rest on case law and commentary concerning the application of the securities laws and other statutes to situations with foreign elements and on our best judgment as to what Congress would have wished if these problems had occurred to it.[44]
 
 
 65
 V. Class Action.
 
 
 66
 If what was before us was a single action with only named plaintiffs of the three sorts above described or three separate actions on behalf of the respective classes, we could promptly proceed to decision. Unhappily that is not the case. Appellants contend that once we have determined that the federal securities laws do not apply to the sales to foreign purchasers, they must be stricken from the class. Plaintiff says that all that is before us is whether the action may be maintained on behalf of some of the purchasers and that, since we have decided it can be, that is the end of the matter; alternatively, if we should reach the issue, the district court could entertain the claims of the foreign plaintiffs as pendent claims for common law fraud.
 
 
 67
 We must first deal with plaintiff's contention that the question of the inclusion of the foreign purchasers is not properly before us because it was not within Judge Carter's § 1292(b) certificate and that we are limited to a remand to the district court for further consideration of the class action determination in light of our decision. The action would then proceed on whatever basis that court decided, with dubious possibilities of review by aggrieved parties at that time, although the propriety of that court's determination would, of course, come before us on any appeal from a final judgment.
 
 
 68
 Even if we were limited to the four corners of the certificate,44a we would not accept plaintiff's argument. The district judge must have recognized the possibility that we might decline to accept his integration theory in its fullest reach, and also his reliance on general economic effects in the United States, yet uphold subject matter jurisdiction with respect to plaintiffs who had been directly affected in this country or to American citizens who had purchased abroad. We do not believe he meant that, in that event, we should be limited to declaring our own views and be powerless to discharge the normal responsibilities of an appellate court to determine their consequences. When he said that a decision by this court would materially advance the ultimate determination of the controversy and, quoting from Bobolakis v. Compania Panamena Maritima San Gerassimo, 168 F.Supp. 236, 240 (S.D.N.Y.1958), "would save . . . the cost and delay of protracted and expensive litigation," he could hardly have been blind to the savings that would result from a ruling on our part that the action could not be maintained on behalf of the many thousands of foreign purchasers if that was our conclusion.
 
 
 69
 Moreover, as we have recently held, our powers on an appeal under § 1292(b) are not so narrowly circumscribed as to preclude consideration and resolution of questions other than those specifically regarded as controlling by the district court at the time of its certification order. See Capital Temporaries, Inc. v. Olsten Corp., 506 F.2d 658, 660 (2 Cir. 1974). See also Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3 Cir. 1974), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). Compare Hurwitz v. Directors Guild of America, Inc., 364 F.2d 67, 70 (2 Cir.), cert. denied, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966). Perhaps in awareness of the difficulties that had arisen with respect to propounding certified questions to the Supreme Court under 28 U.S.C. §§ 1254 and 1255, see Stern & Gressman, Supreme Court Practice Ch. 9, pp. 385-89 (4th ed. 1969); Moore & Vestal, Present and Potential Role of Certification in Federal Appellate Procedure, 35 Va.L.Rev. 1, 10-25 (1949), Congress wrote § 1292(b) differently. While the district court judge is required to state what he considers to be "a controlling question of law," the appeal is from the order here an order upholding subject matter jurisdiction over a class action in which all purchasers in all three IOS offerings were the plaintiff class. See Johnson v. Alldredge, 488 F.2d 820, 823 (3 Cir. 1973), cert. denied sub nom., Cronrath v. Johnson, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). See also 9 Moore, Federal Practice P 110.25(1) at 269-73 (1973). This conclusion as to the broad scope of our review power under § 1292(b) is consistent with the principal purpose of that section as evidenced in its lengthy legislative history. Section 1292(b) was the result of dissatisfaction with the prolongation of litigation and with harm to litigants uncorrectable on appeal from a final judgment, sometimes resulting from strict application of the federal final judgment rule. It was thus designed to cure these difficulties by permitting speedy determination of debatable legal issues, the resolution of which might greatly advance the ultimate determination of the controversy, without requiring the parties first to participate in a trial. See 3 U.S.Code Cong. & Adm.News, 85th Cong., 2d Sess. 5255-5263 (1958); Hearings Before House Subcomm. No. 3 of the House Comm. on the Judiciary on H.R. 6238, 85th Cong., 2d Sess. (1958), H.R.Rep.No.1667, 85th Cong., 2d Sess. 1-2 (1958); S.Rep.No.2434, 85th Cong., 2d Sess. 3-4 (1958); Milbert v. Bison Laboratories, 260 F.2d 431, 433-35 (3 Cir. 1958) (en banc ); Note, Federal Appealability, 75 Harv.L.Rev. 351, 379 (1961).
 
 
 70
 In arguing against retention of foreign purchasers in the class, appellants rely heavily on Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). At first blush the case would scarcely seem pertinent since its precise holding was merely that except when aggregation was permissible, each member of the class and not simply the named plaintiffs must have a claim exceeding $10,000 when that was required as a jurisdictional amount, and no such amount is required for an action under the securities laws. However, appellants find Zahn to have declared a more general principle, namely, "that a person who cannot sue in the federal courts as a named plaintiff because of lack of jurisdiction over his claim, may not be part of a class represented by a named plaintiff over whose claim the federal court has jurisdiction," Andersen brief at 57. The argument continues that if such jurisdiction were claimed to exist for the foreign purchasers on the basis of 28 U.S.C. § 1332, this would be destroyed by the lack of diverse citizenship as between plaintiff Bersch and some of the defendants, and that in any event it is most unlikely that each foreign purchaser has a claim exceeding $10,000.
 
 
 71
 Regrettably plaintiff has not favored us with a response, preferring to rest on his claim, with which we disagree for reasons just developed, that the issue is not before us. Although certain commentators apparently view the effect of Zahn to be limited to cases where a jurisdictional amount was required, see, e. g., Note, The Supreme Court, 1973 Term, 88 Harv.L.Rev. 40, 49 (1974), the dissents of Judge Timbers in this court, 469 F.2d 1033 at 1037-38, and Mr. Justice Brennan in the Supreme Court, 414 U.S. at 302, 94 S.Ct. 505, had pointed to possible broader implications, which have been recognized by other commentators. See, e. g., Note, Ancillary Jurisdiction and the Jurisdictional Amount Requirement, 50 Notre Dame Lawyer 346, 350-63 (1974) (potential implications for ancillary jurisdiction doctrine with respect to (1) Intervention Fed.R.Civ.P. 24; (2) Impleader id. 14(a); (3) Crossclaims id. 13(g); (4) Compulsory Counterclaims id. 13(a); (5) Interpleader id. 22). If Zahn means what appellants assert, it would run counter to the ruling in Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 48 S.Ct. 338, 65 L.Ed. 673 (1921), where the Court held that the complete diversity necessary under Strawbridge v. Curtiss, 3 Cranch (7 U.S.) 267, 2 L.Ed. 435 (1806), was not destroyed by the intervention as plaintiffs in a class action of a class having the same citizenship as the defendant unless this portion of Ben-Hur rests on the distinction between being originally named and later intervening as plaintiffs. Cf. Wichita R.R. & Light Co. v. Public Service Comm'n, 260 U.S. 48, 54, 43 S.Ct. 51, 67 L.Ed. 124 (1922). Appellants could respond that fragile as this distinction may seem, it is the only satisfactory basis for reconciling Ben-Hur with Zahn itself.[45]
 
 
 72
 We think it unnecessary to resolve this difficult issue, an attempt that might lead us into the effect of the rationale alleged to underlie Zahn upon such developments in the law of pendent jurisdiction as our decisions in Astor-Honor, Inc. v. Grosset & Dunlop, Inc., 441 F.2d 627, 629-30 (2 Cir. 1971), and Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 809-10 (2 Cir. 1971). See Hart & Wechsler, The Federal Courts and the Federal System 1078-81 (2d ed. 1973), and D. Currie, Federal Courts: Cases and Materials 394-97, 520-22 (2d ed. 1975). Even if we were to assume that the district court has power to retain the foreign purchasers in the class and entertain the state law claims, it would be an abuse of discretion for it to do so. United Mine Workers v. Gibbs, 383 U.S. 715, 726-27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
 
 
 73
 In terms of the amount at stake it is almost ludicrous to speak of the claims of the foreign purchasers as "pendent". Since the relatively few purchasers with federal claims will almost inevitably rely on the stricter standard of the federal securities laws, entertaining the state law claims of the foreign purchasers would, as a practical matter, introduce a whole new set of issues including issues of choice of law and, if it were to be decided that New York would look to the laws of the countries where the sales were made, the ascertainment and application of the laws of at least fourteen different nations. As Judge Frankel observed in Investment Properties Int'l, Ltd. v. I. O. S., Ltd., CCH Fed.Sec.L.Rep. (1970-1971 Transfer Binder) P 93,011, 90,735 (S.D.N.Y.), aff'd without opinion (2 Cir. 1971) (unreported):[46]
 
 
 74
 If there is no such domestic impact from a substantially foreign transaction, United States courts have no reason to become involved, and compelling reason not to become involved, in the burdens of enforcement and the delicate problems of foreign relations and international economic policy that extraterritorial application may entail. (Emphasis in original.)
 
 
 75
 The management of a class action with many thousands of class members imposes tremendous burdens on overtaxed district courts, even when the class members are mostly in the United States and still more so when they are abroad.[47] Also, while an American court need not abstain from entering judgment simply because of a possibility that a foreign court may not recognize or enforce it, the case stands differently when this is a near certainty. This point must be considered not simply in the halcyon context of a large recovery which plaintiff visualizes but in those of a judgment for the defendants or a plaintiffs' judgment or a settlement deemed to be inadequate. As Judge Frankel stated in his order permitting the case to proceed as a class action:
 
 
 76
 if defendants prevail against a class they are entitled to a victory no less broad than a defeat would have been.
 
 
 77
 Here the record contains uncontradicted affidavits that England, the Federal Republic of Germany, Switzerland, Italy, and France would not recognize a United States judgment in favor of the defendant as a bar to an action by their own citizens, even assuming that the citizens had in fact received notice that they would be bound unless they affirmatively opted out of the plaintiff class,[48] and another affidavit recites that several hundred claims, including those of at least eighteen Americans, against defendant Cornfeld are pending in Switzerland[49] and that at least ninety have been settled. The affidavits are consistent with the conclusion in Von Mehren and Trautman, Recognition of Foreign Adjudications: A Survey and a Suggested Approach, 81 Harv.L.Rev. 1601 (1968), that European courts are far less inclined to recognize foreign judgments than are American courts applying the principles of Hilton v. Guyot, 159 U.S. 113, 202-03, 16 S.Ct. 139, 40 L.Ed. 95 (1895). We do not find it a satisfactory answer that here the defendants may be protected by the running of the statute of limitations in foreign countries. Nothing like a complete survey has been made and apparently the statute will not run in France until 1999. Moreover, in a situation like this, defendants should be entitled to a decision concerning the claims of foreign plaintiffs early in the progress of the litigation.
 
 
 78
 Against this plaintiff urges that foreign purchasers may have abstained from bringing timely suits in their own countries because of reliance on Judge Frankel's determination.[50] Whatever force this might or might not have had if plaintiff had then given notice pursuant to Fed.R.Civ.P. 23(c)(2), as we now know to be required at some stage, Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 172-77, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), none was. If it had been, it would have had to disclose that the class action determination was expressly subject to reconsideration.
 
 
 79
 We therefore direct that the district court eliminate from the class action all purchasers other than persons who were residents or citizens of the United States.
 
 
 80
 There are other problems concerning the future of this action which we leave to the district court since further factual inquiry is needed. The class of residents to whom sales were made in the United States may prove to be so small as to create questions whether this group meets the numerosity requirement of Fed.R.Civ.P. 23(a), particularly since some may not desire to sue,[51] and whether in view of the fact that they were all or predominantly "insiders" of one sort or another, "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).[52] There is also a question whether if plaintiff Bersch did not rely on the prospectus in making his purchase, see note 39 supra, he can properly represent them. If this is resolved favorably to Bersch, there is a further question whether he should also be allowed to represent United States citizens who purchased IOS shares abroad. Perhaps still other questions will arise.
 
 
 81
 VI. In Personam Jurisdiction Crang.
 
 
 82
 In dealing with jurisdiction over the person of Crang, we turn, as did the district court, to Part III of our decision in Leasco, 468 F.2d at 1339-44. We there held "that Congress meant § 27 (of the Securities Exchange Act) to extend personal jurisdiction to the full reach permitted by the due process clause" and that the boundaries of this, in the case of a defendant not personally present at the time of service, were set forth in §§ 35, 36 and 37 of the Restatement (2d) of Conflict of Laws, which themselves in large part merely amplify the central idea contained in the Supreme Court's most recent statement on the subject in Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) that it is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."
 
 
 83
 The first of these, § 35, "Doing Business in State",[53] requires little comment. It is not even contended that Crang comes within (3); although it once had a branch office in New York, this was discontinued several months prior to the IOS offering and long before process was served. Crang's current business, so far as the United States is concerned, consists of buying and selling for Americans securities traded on Canadian markets and arranging with American brokers for its Canadian customers to buy or sell securities traded in American markets.[54] This is not doing business within the United States; if it were, every securities dealer of any significant size anywhere in the world would be "doing business" here.[55] The situation is not changed by the fact that on one occasion in April 1969 a Crang partner visited four New York investment houses in an apparent attempt to drum up trade.[56] No evidence has been adduced of any more recent solicitations of business in the United States by Crang. Even assuming representatives of Crang sporadically visit investment banks and brokerage firms in the United States to solicit the type of business discussed above, this would hardly constitute "doing business" in the sense in which that concept has been developed, even subsequent to the liberalization of personal jurisdiction principles accomplished by International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and Hanson v. Denckla, supra. See, e. g., Bryant v. Finnish Nat'l Airline, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965). Beyond this, except when the doing of business is "so continuous and substantial as to make it reasonable" for the state to go further, see Perkins v. Benquet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), "doing business" affords jurisdiction only for causes of action arising from the business being done.
 
 
 84
 We likewise find no basis for in personam jurisdiction under § 36 ("Doing an Act in State").[57] Crang's only acts in the United States having any relation to its underwriting of IOS shares were two breakfast meetings at the Carlyle Hotel in New York between its partner Howe and Edward Cowett, IOS's chief attorney and one of the principal architects of its organizational structure and operations, who apparently was the central IOS officer involved in the planning and execution of the offering. According to the uncontradicted deposition of Howe the first meeting occurred in late April as a result of a chance encounter the previous day at the office of a mutual business acquaintance. The principal reason for that meeting was to discuss an upcoming quarterly dividend payment of Investors Overseas Management Corp. (ISM), an IOS subsidiary of which both Howe and Cowett were directors and which managed the mutual funds distributed by IOS. During this one hour meeting the "concept" of IOS' going public, a subject which previously had been explored by them several weeks before in Geneva, was discussed.[58] Howe considered IOS to be "a very exciting company" and urged Cowett to permit Crang to manage the Canadian underwriting, if not the entire underwriting. Cowett apparently rejected the latter proposal since Crang was "strictly Canadian and this would be a world-wide underwriting." Although the capital structure of the new corporate vehicle and possible dividend policy, as well as the terms but not the market price and timing of the issue, were discussed in general terms, these discussions were apparently of a preliminary nature with no detailed recommendations, and certainly no final decisions, being made. Whatever the situation may be with respect to subject matter jurisdiction, the connection between these meetings and the injuries to American residents or American citizens abroad from the IOB underwriting was too tenuous to permit those torts to be considered as "arising from" Howe's two breakfasts.
 
 
 85
 There remains for consideration § 37 ("Causing Effects in State by Act Done Elsewhere").[59] The plaintiff's argument here that, under the judge's "integration" theory, everything done by Crang with respect to the IOS underwriting was a "cause" of injuries to the plaintiffs who were residents of the United States raises again the question we did not decide in our discussion of subject matter jurisdiction. We think it unnecessary to do so in this context since, even assuming that because of the integrated nature of the underwritings Crang's acts had some causal relation to the alleged injuries to purchasers of the IOB offering who were American residents or United States citizens, we believe the test for in personam jurisdiction is somewhat more demanding. We said with respect to § 37 in Leasco, 468 F.2d at 1341, that "this is a principle that must be applied with caution, particularly in an international context", see Von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv.L.Rev. 1121, 1127 (1966), and suggested that at minimum the effect within the state must occur "as a direct and foreseeable result of the conduct outside the territory," the language of § 18 of the Restatement (2d) of Foreign Relations Law. Indeed, § 37 itself contains the important qualification "unless the nature of the effects and of the individual's relationship to the state makes the exercise of such jurisdiction unreasonable." While Crang knew of the IOB underwriting, there is nothing to show it had knowledge that some of the purchasers would be persons residing in the United States or United States citizens residing abroad.
 
 
 86
 We therefore affirm the order dismissing the complaint against Crang for lack of in personam jurisdiction.[60]
 
 
 87
 VII. Mandamus Sought by IOS and Cornfeld.
 
 
 88
 IOS and Cornfeld have submitted petitions for mandamus seeking review of the judge's unfavorable rulings with respect to the manner of service of process and inexcusable delay.[61] These rulings, whether right or wrong, are not appropriate for the issuance of this extraordinary writ.
 
 
 89
 IOS' application also sought review of the district court's refusal to step aside with respect to it in favor of the New Brunswick liquidation. Compare Canada Southern Ry. Co. v. Gebhard, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883); Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841 (1935). The district court gave no reasons for its refusal. We think it should have done so. However, it is possible that, in light of our decision, IOS may be satisfied to have this litigation proceed before the district court. If not, it should renew its application for a stay and the district judge should rule upon it, and if the ruling be adverse, IOS may apply to us again.
 
 
 90
 The order is reversed insofar as it sustains subject matter jurisdiction with respect to all purchasers of IOS securities and is affirmed insofar as it sustains such jurisdiction with respect to purchasers who were American residents or citizens. The cause is remanded with directions to modify the class action determination insofar as this includes purchasers who were not American residents or citizens and to consider whether the action should be allowed to proceed as a class action with respect to one or both such classes, in light of the discussion in this opinion. The stay of mailing and publishing notice of the proposed settlement is made permanent. The order dismissing the complaint against Crang for lack of in personam jurisdiction is affirmed. The petitions for mandamus are denied except that with respect to so much of IOS' petition as relates to the refusal of a stay, the denial is without prejudice, as aforesaid. No costs, except in favor of Crang.
 
 
 
 [1]
 An American corporation and its wholly-owned British subsidiary
 
 
 [2]
 The exact size of the plaintiff class has not yet been determined with any precision. In his original complaint, plaintiff Bersch, on the basis of an "estimate" that the average class member purchased 100 shares, alleged that there were approximately 100,000 potential class members. Apparently based on the alleged fact, revealed by discovery, that the average American purchaser bought 3,906 shares, and certain other information derived from the settling defendants, Bersch has now lowered his estimate of the size of the potential class to 25,000. On the record before us it is not possible to ascertain whether this new estimate is reasonable. On its face, if one were to assume that foreign purchasers on average subscribed for as many shares as discovery allegedly has revealed with respect to Americans, then even the 25,000 figure would be a significant overestimate. However, plaintiff's 3,906 average purchase estimate is based in part upon an erroneously high computation of the total number of shares allegedly purchased by Americans. Elimination of an apparently inadvertent double counting error with respect to one major purchaser lowers the total shares purchased by the alleged 386 American purchasers from 1,507,578 to 844,683. Moreover, even after elimination of this error, the average purchase figure is still deceptively high since one of the American purchasers which plaintiff lists in support of his allegations the IOS Foundation of Delaware purchased some 662,895 shares. Exclusion of these shares from the averaging would reduce the average American purchase to around 200 shares, and extrapolation of this to the foreign purchasers would result in a class of some 50,000
 
 
 [3]
 The mutual fund sales business which in 1960 was transferred to I.O.S., Ltd. (S.A.), a Panamanian Company, was founded by Bernard Cornfeld in Paris in 1956. By 1969, in addition to operating more than a dozen mutual fund sales companies throughout the world and a dozen mutual funds of its own, the Company owned ten banks and finance companies, a life insurance company with subsidiaries in six countries, a group of real estate companies, a couple of small publishing enterprises, and a data publishing firm
 
 
 [4]
 The liquidation proceedings against IOS were initiated on August 30, 1973, before Mr. Justice Dickson of the Supreme Court of New Brunswick, Canada, on the petition of the Public Trustee of the Province of Ontario, as creditor of IOS. Subsequently two additional petitions for the liquidation of IOS were filed, one by another creditor, and one by a shareholder. See In re I.O.S., Ltd., 7 N.B.R. (2d) 316 (S.Ct.1973), amended on appeal, 7 N.B.R. (2d) 311 (S.Ct.App.Div.1973). We are told that the filing of the first petition "followed and was in great measure the result of conferences among the governments of Canada and the Provinces of Quebec and Ontario, the regulatory authorities of Luxembourg and of the United States Securities and Exchange Commission." Affidavit of Herbert M. Wachtell, p. 4 n.*, April 16, 1974. During those conferences it was apparently agreed, inter alia, that liquidation of the various interconnected business entities that made up the multi-national IOS complex would be sought by or with the assistance of the relevant government or regulatory authorities of the corporate domiciles of the various key corporations. We are further told that it was agreed at the conference that an informal international committee made up of representatives of the various governments and regulatory authorities referred to above "would periodically meet and generally oversee the liquidation process."
 
 
 [5]
 In 1967, in an apparent effort to sustain sales force loyalty and prevent further growth of dissatisfaction because the promised public market for IOS shares had not yet been created, the Company offered to buy back 10% of any employee's shareholding at the "formula price."
 
 
 [6]
 Ten per cent of the outstanding shares of Gramco Management, Ltd., an offshore mutual fund sales management and investment company specializing in "liquid real estate", and a subsidiary of Gramco International which was founded in 1967, were offered in May, 1969 at $10 per share. At one point these shares apparently were trading at $20 but eighteen months later they were worth only about $2
 
 
 [7]
 There is some internal contradiction between paragraph 4 of the Order which appears to permit sales to officers, directors and full-time personnel outside of the United States and paragraph 8 which begins "(s)ince IOS will, pursuant to the terms and conditions of this Stipulation, conduct all its securities activities outside the jurisdiction of the Commission and limit all future sales to foreign nationals only . . .." (emphasis supplied). Two letters to counsel for the Drexel underwriters in August and September of 1969, in response to earlier inquiries by them as to whether the Drexel group might obtain some form of no action letter from the SEC, did not greatly clarify matters. Although the August letter stated "that any sale of I.O.S., Ltd.'s stock to its employees who are nationals of the United States but residents abroad would be subject to the registration requirements of the Securities Act of 1933," letter from John Heneghan, Assistant Chief Counsel, to Grayson Murphy of Shearman & Sterling, August 21, 1969, the September letter, which purported to contain additional information, stated only that "in connection with the part of the offering managed by Investors Overseas Bank, if any of the 'larger holders of shares of investment companies managed by the company or its subsidiaries,' or any of the 'other persons having business relationships with the company or its subsidiaries,' are United States citizens or nationals, the prohibitions of the Commission's order of May 25, 1967 would be applicable to any offer or sale to such holders or persons." Letter of September 8, 1969
 
 
 [8]
 At the time of the underwriting the organization now known as Drexel Firestone, Inc. operated under the name Drexel Harriman, Ripley
 
 
 [9]
 Defendants Banque Rothschild and Pierson, Heldring and Pierson have submitted uncontradicted affidavits to the effect that they do not maintain any branch or office within the United States. Hill, Samuel & Co., Ltd. has submitted an affidavit to similar effect except that it admits to owning all the shares of Hill Samuel, Inc., a holding company which in turn owns all the shares of Hill Samuel Securities Corporation, a dealer in securities. Both of these companies maintain offices in New York City, as does an affiliated company, Lambert Hammond (U.S.A.) Inc., which is a general insurance broker. However, Hill, Samuel further states that none of these companies with offices in the United States were in any way connected with the IOS underwriting. Guinness Mahon & Co., Ltd. also submitted an affidavit stating that it has never maintained an office in the United States. Moreover, although admitting that one of its subsidiaries Guinness Mahon Representation Co., Inc. had maintained an office in New York City for a number of years, it stated that this subsidiary did not transact any business in the United States, served only as a "communications convenience", and is not authorized to accept service of process on Guinness Mahon's behalf. Plaintiff nowhere contradicted these contentions by affidavit or other proof, although his brief contains an unsupported statement "that (d)efendant Guinness Mahon is also represented in the United States, with an office in New York City. Defendant Hill Samuel likewise has offices in this city."
 
 
 [10]
 The Successor organization to Crang is known as J. H. Holdings, Ltd
 
 
 [11]
 One sale of 2,000 shares of IOS common was made to the Denver Office of Glore Forgan, Wm. R. Staats Inc. by Collier, Norris & Quinlan, a Canadian brokerage firm, for an unidentified customer. Clarke Ambrose, a Drexel officer, learned of the purchase when an employee of Glore Forgan contacted the Drexel Syndicate Department, inquiring as to whether Drexel might be able to aid him in obtaining an additional 8,000 shares to complete the customer's order. Recognizing the possible problems with the SEC that might arise from these transactions, Drexel contacted the president of Glore Forgan and the order was cancelled; moreover the customer was urged to break the transaction, although no information has been provided to us whether this latter effort was successful. The SEC was also informed of the substance of these transactions; the response of the official contacted essentially was that if this was indeed an isolated unintentional transaction no disciplinary action would be taken
 
 
 [12]
 In a release dated July 9, 1964, S.E.C. Release No. 33-4708 and No. 34-7366, 17 C.F.R. § 231.4708, 1 CCH Fed.Sec.Rep. P 1362, the SEC stated that it:
 has traditionally taken the position that the registration requirements of Section 5 of the Act are primarily intended to protect American investors. Accordingly, the Commission has not taken any action for failure to register securities of United States corporations distributed abroad to foreign nationals, even though use of jurisdictional means may be involved in the offering. It is assumed in these situations that the distribution is to be effected in a manner which will result in the securities coming to rest abroad.
 
 
 [13]
 We shall deal in Section IV below with the circumstances of Bersch's purchase and the extent of purchases by other Americans
 
 
 [14]
 See note 2 supra
 
 
 [15]
 An example of this alleged illegal activity was the participation by IOS officers in the smuggling of currency outside of developing countries in violation of their restrictive currency laws. As a result of this activity IOS had been barred from doing business in several of these countries
 
 
 [16]
 No attempt was made to serve defendant Cornfeld until May 15, 1973. See note 61 infra
 
 
 [17]
 Although this seems clear enough to us, apparently it has not been so to others. Judge Ryan, who ruled on the discovery motions, said in colloquy that Judge Frankel "didn't enter any class order. He defined no class. Therefore what he said was dictum." Appellant Andersen says in its brief that "(a) ppeal was hot taken from Judge Frankel's order, since all defendants shared Judge Ryan's opinion that a class had not really been defined, and viewed Judge Frankel's decision as a mere holding action to enable the actual determination to be made by the judge to whom the case would be assigned for all purposes." Whether this view was justified or not, no one has urged that anything turns on the failure to attempt an appeal at that time
 
 
 [18]
 See note 17 supra
 
 
 [19]
 The notice was to be only in English
 
 
 [20]
 Section 30(b) provides:
 (b) The provisions of this title or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this title.
 
 
 [21]
 The court did not pass on the in personam jurisdiction claims of some of the settling defendants. See note 9 supra
 
 
 [22]
 See note 61 infra
 
 
 [23]
 At argument we extended the stay pending decision
 
 
 [24]
 The judge found, among other things, that representatives of IOS, the major underwriters in the Drexel Group, their attorneys and accountants met in New York on numerous occasions to initiate, organize and structure the offering; that a New York law firm was retained to represent the underwriters and had numerous meetings with IOS; that Drexel officials and counsel met with the SEC; that the underwriters retained Price Waterhouse & Co. in New York as accountants to assist in reviewing the operations of IOS and received reports from that firm there; that on one occasion Andersen representatives met in New York with the underwriters to explain why Andersen could not perform a full audit for the period January 1-June 30, 1969, within the time allotted and to discuss the amount of work that Andersen might be able to complete during that period; that preliminary discussions on underwriting discounts and commissions possibly took place in New York in July and August, 1969; that parts of the prospectus were drafted in New York and read over the telephone to Geneva; that prospective underwriters were shown a draft of the prospectus in New York; and that accounts for the proceeds of the underwriting were opened at the Bank of New York and the proceeds in dollars were to be deposited there pending remittance to IOS. Appellants do not seriously dispute these findings. Their contention is rather that the findings give a distorted picture since the work that was done in New York was mostly preliminary or ancillary to the work done in Europe, that the substantial bulk of the work was done in Europe, that all final action was taken there, and that there was no distribution of prospectuses or other promotional literature to purchasers within the United States therefore that any fraudulent misrepresentations were neither made nor relied on in the United States
 
 
 [25]
 A state has jurisdiction to prescribe a rule of law
 (a) attaching legal consequences to conduct that occurs within its territory, whether or not such consequences are determined by the effects of the conduct outside the territory, and
 (b) relating to a thing located, or a status or other interests localized, in its territory.
 Moreover, as we noted in Leasco, supra, 468 F.2d at 1334, "(w)hile the black letter seems to require that . . . not only there should be conduct within the territory but also the conduct relate 'to a thing located, or a status or other interest located in its territory,' Comment A and Illustrations 1 and 2 . . . appear to be satisfied if there has been conduct within the territory." See id. n.3.
 
 
 [26]
 Such problems are not presented when the SEC seeks to enjoin activity as in SEC v. Gulf Intercontinental Finance Corp., 223 F.Supp. 987 (S.D.Fla.1963), and SEC v. United Financial Group, Inc., 474 F.2d 354 (9 Cir. 1973), on which plaintiff relies, or when the action is by named plaintiffs, as in Leasco or in IIT v. Vencap, Ltd., --- F.2d --- (2 Cir. 1975) this day decided
 
 
 [27]
 Plaintiff does not seriously claim that it was required
 
 
 [28]
 Although SEC officials reaffirmed the existence of the registration exemption for certain foreign offerings, see note 12 supra, the potential applicability of the anti-fraud provisions of the securities acts to the transactions here in question was specifically brought to the attention of counsel for the underwriters in a letter from the Secretary of the SEC at an early stage of the planning process:
 However, though Securities Act registration of such an offering (an underwriting of the type described in note 12 supra ) is not required the anti-fraud provisions of the Securities Act and the Securities Exchange Act of 1934 would, in general, be applicable to the activities of a registered broker-dealer participating in such an underwriting.
 Letter from Orval L. Dubois, Secretary, SEC, by Mellye A. Thorson, Ass't Secretary, to Grayson M. P. Murphy of Shearman & Sterling, June 6, 1969.
 
 
 [29]
 Apart from the fact that both cases cited in note 26 were injunction actions by the SEC, the court in Gulf Intercontinental relied in part on misrepresentations and offers contained in advertisements in newspapers that were distributed within the United States, some of which "no doubt" had been read by American investors in this country, 223 F.Supp. at 994-95, and in United Financial the court was dealing with a scheme master-minded by a United States issuer and based in the United States. While Travis v. Anthes Imperial Ltd., supra, 473 F.2d 515, was a class action for damages, the plaintiff class was limited to American shareholders, 331 F.Supp. 797, 799, and the named plaintiffs alleged that they had been subjected to misrepresentations in the United States. Moreover, the court specifically reserved the question whether the action might proceed as a class action until after plaintiffs had completed discovery. Finch v. Marathon Securities Corp., 316 F.Supp. 1345 (S.D.N.Y.1970), and Investment Properties Int'l, Ltd. v. I.O.S., Ltd., CCH Fed.Sec.L.Rep. (1970-1971 Transfer Binder) P 93,001, aff'd without opinion (2 Cir. 1971) (unreported), both private damage suits, look in the other direction, as does the recent decision in SEC v. Kasser, 391 F.Supp. 1167 (D.N.J.1975) (Whipple, Ch. J.)
 
 
 [30]
 Appellants particularly dispute whether there was any causal connection between the disinvestment by foreigners in United States securities and mutual funds and the collapse of IOS in April or May of 1970. They point out that there had been a steady long term decline in the prices of shares traded on the New York Stock Exchange, beginning in 1969 the Dow Jones Index reached 985 in 1968, fell to 746 by February 2, 1970, and reached 631 on May 26, 1970 which continued through most of 1970 but that the index began to rise in the latter half of 1970, reaching 794 on December 1
 
 
 [31]
 We therefore find it unnecessary to consider the contention of certain appellants that even assuming that the IOS collapse did have a substantial adverse effect on United States securities markets and the ability of American firms to obtain investment capital from foreign sources, the allegedly fraudulent underwriting occurred many months prior to the collapse and was wholly unrelated to it
 
 
 [32]
 In effect this court was acting in lieu of the Supreme Court by virtue of a 1944 amendment to 15 U.S.C. § 29 (certification of appeal of Government civil antitrust action to court of appeals when no quorum of Justices in Supreme Court). See United States v. Aluminum Co. of America, 320 U.S. 708, 64 S.Ct. 73, 88 L.Ed.2d 415 (1943)
 
 
 [33]
 There may be agreements made beyond our borders not intended to affect imports, which do affect them, or which affect exports. Almost any limitation of the supply of goods in Europe, for example, or in South America, may have repercussions in the United States if there is trade between the two. Yet when one considers the international complications likely to arise from an effort in this country to treat such agreements as unlawful, it is safe to assume that Congress certainly did not intend the Act to cover them
 
 
 [34]
 These may be either the very securities sold or bought or other securities of the same issue as in Schoenbaum
 
 
 [35]
 The Steele case is distinguishable, in part on this basis. There the Bulova Watch Company, a New York corporation, brought an action in the federal District Court for the Western District of Texas for trademark infringement in violation of the Lanham Trade-Mark Act of 1946, 15 U.S.C. §§ 1051-1127, against an American citizen residing in San Antonio, Texas, who conducted a watch manufacturing business in Mexico City. By its terms the Lanham Act was intended to reach "all commerce which may lawfully be regulated by Congress." § 45. The defendant had taken advantage of the fact that the Bulova name had not been registered in Mexico. Assembling Swiss watch movements and dials and cases imported from that country and the United States, he stamped "Bulova" on his watches and sold them as such. In finding subject matter jurisdiction, the Court noted that spurious "Bulovas" had filtered back into the United States. This specific 'effect' of the assembly and distribution of these watches was reflected in the many complaints which Bulova's Texas representatives received from retail jewelers in the Mexican border area whose customers brought in for repair defective "Bulovas" which upon inspection often turned out not to be products of that company. This effect on Bulova's business within the United States was the "direct and foreseeable" result of defendant's activities in Mexico, within the meaning of § 18 of the Restatement (2d). Nothing in the Bulova opinion suggests that the Court would have found subject matter jurisdiction if all that was proved was that Steele's "Bulovas" gave the American watch-making industry a bad name in foreign countries
 A second distinction between the instant situation and Steele stems from the many delicate questions of foreign relations law that potentially may arise here, as well as the problem of judgment recognition that is discussed below, see p. 3178 infra. Prior to the Supreme Court's decision in Steele the Mexican courts had nullified the defendant's registration of the Bulova name. The Court was careful to point that fact out, noting that the possibility of any potential conflict between the sovereignty of another nation and the exercise of its equity powers by the district court was thus eliminated. An analogous problem is presented here insofar as the United States may be asserting jurisdiction in order to apply its laws to activities that more properly are the subject of regulation by other sovereign states, and which currently are the subject of litigation there.
 
 
 [36]
 Someone, likely whoever filled in Ms. Torres' name and address, also crossed out by typing consecutive x's the name of the organization to which the completed subscription was intended to be returned at the time of printing, namely Investors Overseas Limited, whose name and Swiss mailing address are barely discernable despite the crossing out by x's
 
 
 [37]
 See note 36 supra
 
 
 [38]
 Three months later in an affidavit Bersch stated that one of the prospectuses had been mailed to him at his home in New York
 
 
 [39]
 It is unclear precisely when Bersch considered his purchase to have been "completed" by which time he claims to have read all three prospectuses. Two possible dates immediately spring to mind: September 3, 1969, when he filled out his subscription; alternatively, October 15, the date when IOS accepted the subscription for final delivery of the shares. Although appellants argue for the former, it is far from certain that Bersch did not consider the latter date to be the date of purchase. Since he was an American citizen purchasing common shares of a foreign issuer, his purchase was potentially subject to the Interest Equalization Tax, which was then still in effect, and which levied a significant tax on the acquisition of such investment interests by Americans. See IRC §§ 4911, 4920(a)(4)(A). See generally IRC §§ 4911-4921; 4931; 6011(d); 6076; 6680-81; 7241. However, since Bersch was purchasing his shares as part of a secondary offering some of the sellers in which were American citizens his purchase arguably fell within the prior American holder exception to the tax. IRC § 4918. On an application form, dated January 28, 1970, to the Internal Revenue Service for a "Certificate of Prior American Ownership and Interest Equalization Tax Compliance", which had been supplied to Bersch by IOS, and was signed by him, the date of purchase was stated as October 15, 1969
 
 
 [40]
 Presumably included within this latter group are the four alleged American resident purchasers whom Bersch also included in his list of alleged American sellers
 
 
 [41]
 The argument for so holding would be that the public underwriting was an almost necessary component of the secondary IOB offering, because (1) a large public market was established in which purchasers under the secondary offering might dispose of their shares in any case this increased liquidity of the shares made the secondary offering more attractive; (2) a greater degree of credibility was accorded the IOB offering by the fact that a public offering was being made by respected investment banking houses; (3) although arguably a large secondary offering could have created a quasi-public market, such an offering alone might have appeared too much like a bail out
 
 
 [42]
 In response to inquiries by the SEC with respect to whether, and to what extent, Americans had purchased IOS shares at the "public offering", IOS' counsel admitted that approximately 385 "American persons" were known to have acquired such shares. Since many shares of IOS were held in the form of bearer share warrants, making it impossible to determine the ownership thereof, many additional Americans may have in fact been purchasers
 
 
 [43]
 While plaintiff is necessarily speculating, there appears to be substantial logic in his assertion that the primary and secondary features of the offering were necessary concomitants. The latter, which was an opportunity for management to realize on their investment, provided the incentive for the primary offering. The primary offering managed by Drexel created the market for management to realize its profit in the secondary offering managed by Crang and IOS. While this relatedness of purpose is difficult to document, sufficient ties have been demonstrated to support plaintiff's contention that the three offerings were so integrated as to have their prime movers collectively considered for purposes of subject matter jurisdiction
 
 
 [44]
 For a consideration of the issues presented by the extraterritorial application of Rule 10b-5 see Mizrack, Recent Developments in the Extraterritorial Application of Section 10(b) of the Securities and Exchange Act of 1934, 30 Bus.Lawyer 367 (1975); Comment, The Transnational Reach of Rule 10b-5, 121 Penn.L.Rev. 1363 (1973)
 44a The defendants have asked that the court's determination that it has subject matter jurisdiction and in personam jurisdiction over IOS and Cornfeld filed this day be certified for appeal to United States Court of Appeals pursuant to 28 U.S.C. § 1292(b). The issue of subject matter jurisdiction clearly meets the statutory criteria. While the jurisdictional reach of our securities laws has been settled and clarified by our Court of Appeals in Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) and Leasco Data Processing Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972), there is substantial ground for difference of opinion as to whether the ratio decidendi of those cases was properly applied in the instant case. Moreover, the question of subject matter jurisdiction is a controlling issue of law in this case. If the court is in error, the whole controversy could be terminated. The basis for the court's determination was that the tripartite offerings involved were an integrated entity and not three distinct, separate and independent transactions. An immediate appeal, if the court is in error, will materially advance the ultimate determination of the controversy and "would save * * * the cost and delay of protracted and expensive litigation." Bobolakis v. Compania Panamena Maritima San Gerassimo, 168 F.Supp. 236, 240 (S.D.N.Y.1958). Therefore, the request that the determination in respect of subject matter jurisdiction be certified for appeal pursuant to 28 U.S.C. § 1292(b) is granted.
 
 
 [45]
 The dissenters in Zahn strongly urged the authority of Ben-Hur, 414 U.S. at 308-10, 94 S.Ct. 505, but the majority did not respond
 
 
 [46]
 See Investment Properties Int'l, Ltd. v. I. O. S., Ltd., 459 F.2d 705, 706 n.1 (2 Cir. 1972)
 
 
 [47]
 This is illustrated by the problem of notice. On the facts of this case one must have pause over sending notices only in English, as was directed in connection with the proposed settlement. The fact that the Drexel prospectus stated "(t)he English language version . . . shall control any question arising from its translation into other languages", thereby apprising non-English speaking purchasers that the English language might possibly become relevant to the final determination of their rights, in no way justifies notice only in English. On the other hand, if notice is to be sent in several languages, can the court simply delegate responsibility to insure accuracy?
 
 
 [48]
 These affidavits further state that although the binding effect of a foreign class action judgment upon non-appearing members of the class had not been decided by a court in any of these jurisdictions, had an "opt in" form of notice one which required a class member to sign and return a writing agreeing to be bound by any judgment in the proceeding been adopted by the district court as urged by certain of the defendants, it was far more likely, although still not certain, that in several of these jurisdictions a prior judgment for defendant in the class action would serve as a bar to an action by any person who had joined the class
 
 
 [49]
 A criminal proceeding was instituted in November, 1971 against Cornfeld, Swiss law permits intervention by civil parties in a criminal proceeding, and pursuant to such intervention at least 395 claimants of 22 nationalities have sought full reparations for any damages they may have suffered as a result of their purchases
 
 
 [50]
 Counsel for plaintiff tells us that a Swiss attorney representing plaintiffs in the action then pending visited him in New York for the purpose of "intervening" these claimants in the instant action and that counsel advised this was unnecessary in light of Judge Frankel's ruling. But that ruling was stated to be subject to reconsideration, as it necessarily was under Fed.R.Civ.P. 23(a)
 
 
 [51]
 See also note 40 supra
 
 
 [52]
 Other difficulties are created by the fact that plaintiff's complaint alleges that in addition to the fraudulent nature of the three offering prospectuses, the purchaser class was defrauded by statements by Mr. Cornfeld and other IOS officials concerning IOS's financial prospects and business operations made at press conferences, in speeches, magazine articles and brochures, as well as on television. Since these statements were apparently disseminated in various forms throughout the world, with only a limited portion of the composite likely having been received by a particular class member, separate proof of reliance, materiality, and causation may be required for each class member
 
 
 [53]
 § 35. Doing Business in State
 (1) A state has power to exercise judicial jurisdiction over an individual who does business in the state with respect to causes of action arising from the business done in the state.
 (2) A state has power to exercise judicial jurisdiction over an individual who has done business in the state, but has ceased to do business there at the time when the action is brought, with respect to causes of action arising from the business done in the state.
 (3) A state has power to exercise judicial jurisdiction over an individual who does business in the state with respect to causes of action that do not arise from the business done in the state if this business is so continuous and substantial as to make it reasonable for the state to exercise such jurisdiction.
 
 
 [54]
 As to these latter transactions Crang received no commission
 
 
 [55]
 Plaintiff also relies on two SEC broker-dealer registrations, one in 1956 and the other in 1970, copies of which were annexed to its brief. These papers were not called to the attention of the district court and thus are not properly before us, see, e. g., Dictograph Prods. Co. v. Sonotone Corp., 231 F.2d 867 (2 Cir.), appeal dismissed per stip., 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956); Jaconski v. Avison Corp., 359 F.2d 931, 936 n.11 (3 Cir. 1966); United States v. Summit Fidelity & Surety Co., 408 F.2d 46 (6 Cir. 1969); if plaintiff considered them sufficiently important, he should have moved to reopen the record. In fact the papers do not advance plaintiff's cause. We are told by Crang that the 1956 registration related to the former New York office which was closed effective April 1, 1969 and that the 1970 registration was by a successor corporation and not by the partnership that is here being sued. Plaintiff's statement "Defendant Crang executed a consent to the service of process upon the SEC which was operative during the relevant period" is misleading both on these grounds and because the consent in the 1956 registration was only "that notice of any proceeding before the Commission in connection with the application or with registration thereunder may be given (to the person named below)." The consent in the 1970 form is similar. Neither is a general consent to service of process
 
 
 [56]
 By deposition the Crang partner stated that during 1969 he visited New York only four, or at most, five times. In addition to the trip just discussed and one relating to a breakfast meeting with Cowett of IOS discussed at p. 999 infra, he recalled one trip which essentially had been a social call on the owner of a Canadian securities firm and another which had been devoted to purchasing furniture for his wife
 
 
 [57]
 § 36. Doing an Act in State
 (1) a state has power to exercise judicial jurisdiction over an individual who has done, or has caused to be done, an act in the state with respect to any cause of action in tort arising from the act.
 
 
 [58]
 Howe considered the idea of IOS' going directly public at that time to be only a concept, instead of a definite plan the details of which remained to be considered, since for many years the strategy had been to take each of IOS' subsidiaries public prior to an offering of the parent. See pp. 978-979 supra
 
 
 [59]
 § 37. Causing Effects in State by Act Done Elsewhere
 A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable.
 
 
 [60]
 In light of this holding we have no occasion to consider Crang's argument that it comes within the exemption provided in § 30(b) of the Securities Exchange Act, see note 20 supra. Compare Kook v. Crang, 182 F.Supp. 388, 390-91 (S.D.N.Y.1960)
 
 
 [61]
 Section 22(a) of the Securities Act of 1933 and § 27 of the Securities Exchange Act expressly authorize extra-territorial service in any district "of which the defendant is an inhabitant or wherever the defendant may be found." The manner of service is prescribed by Fed.R.Civ.P. 4(i)(l )(D) which provides for service "by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served." Although Bersch filed his complaint in 1971, no attempt to serve Cornfeld was made until May 15, 1973 when a summons and complaint were made on a Ms. Diethild Gainer at a residence in Beverly Hills, California. At that time Cornfeld was being held in St. Antoine Prison, Geneva, Switzerland. In September, 1973 plaintiff obtained a summary default order against Cornfeld which was vacated in December of that year. Cornfeld was finally served by mail at St. Antoine Prison in February, 1974. Three attempts were made to serve IOS. The first was in 1972 to an English address which it apparently did not then occupy and was returned marked "Refused" along with some markings that appear to be initials. In February, 1974 two additional attempts were made to serve IOS by sending letters to its former principal executive offices in Geneva and to its New Brunswick headquarters. For several reasons not necessary to consider here IOS contends that it was not "found" at any of these addresses, and that even if it were, none of the attempted services were in conformity with the procedural requirements of Rule 4(i)(2)