**Dixon R. DOLL, Plaintiff,**

v.

**JAMES MARTIN ASSOCIATES (HOLDINGS) LTD., a Bermuda corporation formerly known as DMW (Holdings) Ltd., Anthony Carter, James Martin, Ian Palmer, Richard Murch, Arnold A. Francis, Edward Richards and Ardon Management Services, Ltd., Defendant.**

**Civ. A. No. 84CV–7282–AA.**

United States District Court,
E.D. Michigan, S.D.

Dec. 21, 1984.

Martin J. Smith, Kantner & Smith, Ann Arbor, Mich., for plaintiff.

Kent P. Talcott, Ann Arbor, Mich., for defendant.

### MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This case is before the court on the motions of all defendants to dismiss. For the reasons stated herein, the motions are granted in part and denied in part.

### FACTS

The facts are largely uncontested by defendants for the purposes of these motions, although there are some points of dispute concerning the extent of the defendants' business activities in this country. For purposes of these motions, all disputed facts must be resolved in favor of plaintiff, *Bonney v. Upjohn Co.*, 487 F.Supp. 486,

491 (W.D.Mich.1980). Because the motions and responses thereto are supported by affidavits, they will be treated as motions for summary judgment in accordance with Fed.R.Civ.P. 12(c).

### Jurisdictional Facts

The controversy focuses upon an alleged freeze-out scheme directed against plaintiff, a minority shareholder in a closely held Bermuda corporation. The cast of characters in this drama (and particularly their places of residence) is significant because of jurisdictional issues that are raised by the motions. Plaintiff is alleged to be a United States citizen and resident of Ann Arbor, Michigan. Defendant James Martin is alleged to be a citizen of the United Kingdom and a resident of Bermuda, who maintains a temporary residence in Vermont. Defendant Anthony Carter and Ian Palmer are alleged to be citizens of the U.K. residing in London. Defendants Richard Murch, Arnold Francis, and Edward Richards are alleged to be citizens and residents of Bermuda. Defendants James Martin Associates (Holdings) Ltd. (hereafter JMA) and Ardon Management Services, Ltd. are alleged to be Bermuda corporations with their principal places of business in Hamilton, Bermuda.

Martin is alleged to be a principal shareholder and chairman of the board of directors of JMA. Carter is alleged to be a principal shareholder, president and director of the company. Murch is alleged to be the vice-president and a director. Palmer is alleged to be a technical director. Richards and Francis are co-counsel for the company.

In January of 1982, plaintiff, along with Martin and Carter, formed the precursor to JMA in Bermuda. That entity was to serve as a holding company of the stock of various subsidiaries, which designed and marketed computer software products. Each of the original incorporators owned a one-third interest in the holding company, holding 4,000 shares each. Later, each agreed to sell 400 shares to Palmer as part of the latter's compensation.

The primary facts with respect to the jurisdictional issues in the case are provided by the affidavits of the parties. Plaintiff asserts that he received a call at his Ann Arbor residence from Carter on August 15, 1983. Carter apparently made his first pitch to plaintiff, urging the latter to divest himself of his JMA holdings at that time. Ten days later, plaintiff received a letter from Carter expressing Carter's reasons for wanting plaintiff out of JMA. Five days later (August 30) plaintiff went to Martin's home in Vermont to meet with Martin and Carter, at which time Carter continued to urge plaintiff to sell out. Plaintiff alleges that Carter threatened to liquidate plaintiff's interest at JMA at that time.

On September 8, Carter sent another letter to plaintiff, again expressing the former's position concerning plaintiff's release of his interest in JMA. Plaintiff met with Martin and spoke to Carter again on the phone during September concerning a possible buy-out of plaintiff's interest.

Finally, plaintiff met with Carter in New York in January of this year, and with Carter and Ian Palmer in Washington, D.C. in May, for discussions concerning a negotiated settlement of the differences between the parties.

Defendants make the following assertions in the affidavits that they have submitted in support of these motions:

(1) Gwyn Tucker, an officer of defendant Ardon Management Services, asserts that Ardon is a Bermuda corporation which has "neither visited nor conducted any business in the U.S.".

(2) Defendant Murch asserts that he is a citizen of the U.K. residing in Bermuda. He is V.P. and a director of JMA, and asserts that he has never transacted business in the U.S. on behalf of JMA or entered the U.S. for the purpose of conducting business with plaintiff.

(3) Defendant Francis asserts that he is a resident and citizen of Bermuda, and a director of JMA. He also asserts that he has never entered the U.S. to transact busi-

ness with plaintiff, nor has he ever transacted business in the U.S. for JMA.

(4) Defendant Richards asserts essentially the same facts as does Francis.

(5) Defendant Palmer alleges that he is a citizen of New Zealand who resides in London. He is a technical director of JMA, and also alleges that he has never conducted business in the U.S. on behalf of JMA, but has conducted business in the U.S. on behalf of various operating subsidiaries thereof.

(6) Defendant Carter asserts that he is a citizen of the U.K., residing in London. He is a director and the president of JMA. He asserts that he has frequently conducted business in the U.S. on behalf of a subsidiary of JMA, but not on behalf of JMA.

There is no affidavit submitted by defendant Martin as to the extent of his activities in the U.S. or the transaction of business with plaintiff.

### The Alleged Scheme

In the summer of 1983, Carter initiated discussions with plaintiff concerning a buyout of the latter's interest in the company. The parties were unable to reach an agreement on the value of plaintiff's shares, however, and Carter subsequently threatened to "dilute you (plaintiff) right out of the company" if the latter failed to come to terms. Defendants attempted to call a meeting of the board of directors, of which plaintiff was a member, and a shareholders meeting, but plaintiff resisted their efforts, denying them a quorum and an opportunity to proceed. Defendant Murch thereafter initiated what plaintiff has characterized as

a "friendly lawsuit" against the company in the Supreme Court of Bermuda, requesting the court to order that the company's annual general meeting of shareholders be convened without the necessary quorum. Plaintiff alleges that defendants sought to notify him of this Bermuda lawsuit by a letter that was sent to an undeliverable address [1] (a fact which, according to plaintiff, clearly indicates an intent not to disclose to him the occurrence of the lawsuit). The Bermuda court granted the requested relief, and plaintiff was advised on May 1 of the order of the court, and of the shareholder's meeting and its date. The meeting took place three days later.

At the meeting, the bylaws of the company were amended to reduce the quorum requirement from 75% to 51%. The shareholders also elected a new board of directors, of which plaintiff was no longer a member. Finally, the shareholders authorized an increase in the capital of the company by the issuance of one and one-half million shares, at a price of $1 per share. Although the JMA shares were closely held, and apparently never traded prior to the dispute at issue in this case, plaintiff states that they had an approximate value of $90 per share. Further, the issuance of these new shares at a value significantly below that of the currently existing shares was not accompanied by a stock split of the previous existing shares, so as to maintain the absolute value of those shares. The effect of the proposed increase in capital would be to reduce the value of the shares held by plaintiff from $90 per share to a value of $1.78 per share.[2]

---

1. Plaintiff states that the notice was sent to him in an envelop bearing the address:
   Mr. Dixon R. Doll
   Ann Arbor, Michigan 48104
   USA
2. Plaintiff bases his estimate of the value of his original stock on Carter's final offer of $325,000 for the 4,000 shares, or $81.25 per share. His arithmetic with respect to the dilution proceeds on the assumption that the original stock was worth $100 per share. Because 1,200 shares were initially issued, the total capital value would be $1.2 million dollars. Assuming that all of the 1.5 million new shares were issued at

a par value of one dollar, the total capital value would be increased to $2.7 million, but there would now be 1,501,200 shares with an equal value (due to the absence of stock split) of $1.78.

Regardless of the accuracy of plaintiff's estimates of the value of the original shares, it is apparent that issuance of the new shares according to the plan alleged in the complaint would work a substantial reduction in both the absolute value of plaintiff's holdings, and in his relative control in the company, expressed as a percentage of shares held.

The corporate secretary (defendant Ardon Management Services) thereafter sent a letter to plaintiff at his Ann Arbor address, indicating that he was entitled to purchase four hundred ninety-nine thousand five hundred (499,500) shares based upon his holding of four thousand shares of the original stock. The letter also advised plaintiff that a 100% call was made upon the newly created shares, and plaintiff would have to tender the full price of those shares, $499,500, within fourteen days if he wished to purchase them. Failure to purchase the shares would be deemed a renunciation, and the shares could thereafter be disposed of as the company saw fit.

Plaintiff contends that he requested certain financial information from the company to help inform his decision concerning purchase of the new shares, but that such information was denied him by the defendants.[3] Plaintiff subsequently decided not to purchase the new shares, but instead initiated this action to enjoin the corporate defendant from issuing the shares, and transferring them to the individual defendants or any third parties. The complaint alleged that the conduct of the defendants amounted to violations of several enumerated provisions of the federal securities laws, to wit: § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and §§ 12(2) and 17 of the Securities Act of 1933, 15 U.S.C. § 77l(2) and 77q.[4] Plaintiff

3. Defendants concede in their brief in support of these motions that they failed to provide plaintiff with certain information that he requested after receiving the offer. They argue, however, that this failure is attributable to plaintiff, who refused to provide them with information to which only he had access, absence of which rendered defendants' ability to disclose impossible.

The court does not reach the issue of whether defendants violated their duties to disclose all material information in connection with the offer of the new shares, and does not intimate any view about whether the failure of total disclosure, if any, was the fault of either plaintiff or his adversaries.

4. Those statutes provide as follows:
§ 77l. Civil liabilities arising in connection with prospectuses and communications
Any person who—
(1) offers or sells a security in violation of section 77e of this title, or
(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchase not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such secur-

ity with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
§ 77q. Fraudulent interstate transactions
Use of interstate commerce for purpose of fraud or deceit
(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
Use of interstate commerce for purpose of offering for sale
(b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective of such consideration and the amount thereof.
§ 78j. Manipulative and deceptive devices
It shall be unlawful for any person, directly or indirectly, by the use of any means or instru-

**516**

has also brought claims under the Bermuda Companies Act, and unspecified provisions of "Michigan law." Finally, plaintiff alleges that the conduct of the individual defendants amounted to a breach of their fiduciary duties of loyalty towards plaintiff as a minority shareholder in the company. In addition to his request for injunctive relief, plaintiff prays for monetary damages.

## DISCUSSION

The motions raise the two-fold issue of whether this court has *in personam* jurisdiction over any of these defendants, and whether it has subject matter jurisdiction over the events that give rise to this action.

### In Personam Jurisdiction

Plaintiff has asserted personal jurisdiction over the various defendants under § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and the long-arm statutes of this state, M.C.L.A. §§ 600.705 and 600.-715.[5] He has raised claims against all defendants under both state and federal law. The principal constitutional limitation upon this court's exercise of personal jurisdiction over foreign defendants is of course the due process clauses of the fourteenth amendment (with respect to the pendent state law claims) and the fifth amendment (with respect to the federal law claims). Under either constitutional provision, the

---

mentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
  (a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
  (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**5.** The Michigan statutes provide in pertinent part as follows:
  600.705 Limited personal jurisdiction over individuals
  The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representative arising out of an act which creates any of the following relationships:
    (1) The transaction of any business within the state.
    (2) The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort.
  600.715 Corporations; limited personal jurisdiction
  The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this

state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:
    (1) The transaction of any business within the state.
    (2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.
  The federal statute provides in part as follows:
    The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.
  Although § 27 applies by its terms only to actions arising under the Securities and Exchange Act, at least one court has held that where claims under both the 1933 and 1934 Acts are joined in a single action, the venue and jurisdictional requirements of § 27, and not the more restrictive requirements of the 1933 Act, will apply to all claims, *Hilgeman v. National Insurance Co.*, 547 F.2d 298, 301 at n. 5, *reh. denied* 564 F.2d 416 (5th Cir.1977).

"minimum contacts" test, first enunciated by the Supreme Court in *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and later developed in *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) and *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), is the starting point of this court's analysis.

The leading case in this circuit on the issue of the due process limits of the *in personam* jurisdiction of a court operating under a long-arm statute similar to those involved in this case is *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374 (6th Cir.1968). The opinion set forth a three-part test that is still consistently followed by the courts of this district in their determination of whether a foreign defendant is amenable to suit in Michigan. The test is stated as follows:

> From these two cases, three criteria emerge for determining the present outerlimits of *in personam* jurisdiction based on a single act. First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* at 381.

Plaintiff argues that JMA clearly satisfied the first requirement of purposefully availing itself of the privilege of acting in this state when it sent into this state the letter soliciting funds and offering shares to plaintiff. Second, the cause of action, securities fraud under the relevant federal statutes, arose from the failure of defendants to transmit material information to plaintiff in conjunction with the offer. Third, plaintiff argues that the consequences of JMA's wrongful conduct, the diminution in plaintiff's interest in the company, were sufficient to implicate the concerns of this state that its residents have a convenient forum when harmed by out-of-state defendants.

· Plaintiff focuses his argument on defendant JMA alone, and fails to demonstrate how the discrete conduct of the individual defendants or of Ardon also satisfied the *Southern Machine* criteria.

▮ Assuming that this court has jurisdiction over JMA, the fact that the individual defendants were directors and officers of JMA at the time of the salient, jurisdiction-creating event (the transmission of the offer to sell the newly-created shares to plaintiff), is not sufficient to create jurisdiction over those persons. Jurisdiction over individual officers and employees of a corporation may not be predicated upon the court's jurisdiction over the corporation itself, unless the individuals are engaged in activities within the jurisdiction that would bring them within reach of the state's long-arm statute, *cf. National Can Corp. v. K Beverage Co.,* 674 F.2d 1134 (6th Cir.1982), *see generally* 4 Wright & Miller, *Federal Practice and Procedure,* § 1069 (1983 Pocket Part).

Plaintiff has not argued that JMA was a mere corporate shell established to shield the individual officers from liability. The question then becomes whether or not the individual defendants engaged in sufficient commercial intercourse in this state to subject themselves to this court's jurisdiction. The present record indicates that Francis, Richards, Palmer, and Murch were acting entirely in their corporate capacity when they authorized the issuance of the new shares and the transmission of the offer to plaintiff in this state. They apparently had no other contacts with this state in connection with the alleged scheme. Indeed, the principal allegation against Murch is that he instigated a lawsuit against JMA in Bermuda. The allegations against Francis, Richards, and Palmer are thinner still. Their participation in the alleged scheme is apparently limited to their affirmative vote at the May 4 director's meeting on the issuance of the new shares and the trans-

mission of the offer to sell to plaintiff. Defendant Ardon's role in the scheme appears to be limited to that of courier of the offer to plaintiff. There is no allegation that Ardon advised JMA or any of the other defendants concerning the strategy or effectuation of the alleged scheme.

The principal actors in the alleged scheme appear to be Martin and Carter. Both had substantially greater business dealings in this country than did any of the other defendants. Carter in particular transmitted a number of communications to plaintiff in this state, on behalf of JMA, prior to the formal offer to sell the new shares. Martin is also alleged to have played a prominent role in pressuring plaintiff to dispose of his shares in JMA.

■■■ The question of the existence of personal jurisdiction in this court over any of these defendants is a close one. The court concludes, on the present record, that it has jurisdiction only over JMA, Martin, and Carter. Neither Richards, Francis, Murch, nor Palmer undertook sufficient affirmative conduct with foreseeable consequences in this state to subject themselves to the reach of this court's jurisdiction. The court concludes that those cases relied upon by plaintiff to support his assertion that jurisdiction exists over those persons involved a tighter nexus between this state, the particular defendant over whom jurisdiction is sought, and the cause of action, cf. Southern Machine, supra, (defendant entered into contract for plaintiff to manufacture and market machines in Tennessee, and thereby subjected itself to jurisdiction of Tennessee courts); K Mart Corp. v. Knitjoy Mfg., Inc., 542 F.Supp. 1189 (E.D. Mich.1982) (defendants who transmitted fraudulent statements to plaintiff located in Michigan, thereby inducing plaintiff to purchase goods from those defendants, subjected themselves to the jurisdiction of this court); Hamilton Miller, Hudson & Fayne Travel v. Hori, 520 F.Supp. 67 (E.D. Mich.1981) (defendant's use of Michigan agents to serve process on plaintiff in this state sufficient to vest this court with jurisdiction over defendants in plaintiff's subse-

quent action for malicious prosecution); Microelectronic Systems Corp. v. Bambergers, 434 F.Supp. 168 (E.D.Mich.1977) (defendant's purchase of goods from Michigan distributor constituted sufficient contact for exercise of limited personal jurisdiction of this court over that defendant). In particular, there is no allegation on the present record, let alone evidence tending to support such an allegation, that any of the defendants other than Martin and Carter undertook affirmative conduct that was directed to this state, other than the mere approval of the issuance of the new shares and the offer to sell some of those shares to plaintiff. This is simply not enough. The court concludes that the minimal participation of Palmer, Murch, Francis and Richards in the alleged scheme was too attenuated from the precise facts that undergird the various theories of liability in this case to subject them to answer for their conduct in this distant and foreign tribunal.

For the foregoing reasons, all claims against Palmer, Murch, Francis and Richards are dismissed without prejudice.

### Subject Matter Jurisdiction

Subject matter jurisdiction over the federal securities claims is predicated upon 15 U.S.C. § 78aa. Jurisdiction over the Michigan and Bermuda law claims is alleged to rise under this court's pendent jurisdiction.

Defendants attack the assertion of this court's subject matter jurisdiction largely on the same grounds that they deployed in contesting the assertion of personal jurisdiction: that none of the defendants engaged in securities transactions in this country such as to create subject matter jurisdiction over the dispute at issue. Section 27 of the Securities and Exchange Act provides for nationwide service of process in actions arising under the securities laws, Fitzsimmons v. Barton, 589 F.2d 330, 333 (7th Cir.1979). Defendants contend that they cannot be found anywhere in this country, and further that none of them (apart from Martin, who does not contest this point) have conducted sufficient busi-

ness in this country to support a finding that they are "doing business" in this country such as to subject themselves to jurisdiction under the securities laws.

The parties have relied upon a pair of cases from the Court of Appeals for the Second Circuit for their opposing positions on this issue, each side seeking to distinguish the case relied upon by its opponent and buttress and expand the holding of that it advances. Plaintiff relies upon *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir.1972). In that case, a series of alleged misrepresentations concerning an English corporation were made in the United States to officers of a publicly held American corporation, who were being induced to purchase stock of the former. The court concluded that it had both *in personam* and subject matter jurisdiction under the securities laws, notwithstanding the fact that other misrepresentations were made in England. The court construed the language of § 27 as follows:

> The second sentence and the first portion of the third deal with venue; the last portion of the third speaks expressly only to service of process. See *United States v. Scophony Corp.*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); *Arrowsmith v. United Press International*, 320 F.2d 219, 227–228 (2 Cir.1963). While Congress was doubtless thinking mainly in terms of exercising its power "to provide that the process of every District Court shall run into every part of the United States," *Robertson v. Railroad Labor Board*, 268 U.S. 619, 622, 45 S.Ct. 621, 622, 69 L.Ed. 1119 (1925), use of the word "wherever", rather than "where" or "in which", demonstrates an intention to authorize service on a defendant who can be "found" only in a foreign country, and although the section does not deal specifically with *in personam* jurisdiction, it is reasonable to infer that Congress meant to assert personal jurisdiction over foreigners not present in the United States to but, of course, not

beyond the bounds permitted by the due process clause of the Fifth Amendment. *Id.* at 1340.

Defendants purport to distinguish *Leasco* on the grounds that the alleged misrepresentation in this case, (in fact an alleged failure to disclose materially significant financial information in connection with their offer to sell plaintiff the additional shares of stock), was sent from outside of the United States. They rely upon the subsequent case of *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.) *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975) which distinguished *Leasco* and another case from that circuit, *Schoenbaum v. Firstbrook*, 405 F.2d 200, *rev'd on the merits*, 405 F.2d 215 (2d Cir.1968) (*en banc*), in holding that certain conduct that occurred outside of the United States could not support an assertion of jurisdiction by the district court under the securities laws. *Bersch* dealt exclusively with the issue of subject matter jurisdiction, and its facts were more intricate than those of *Leasco* or the instant case. In brief summary, the case involved an offering of securities of a Canadian corporation, the underwriters of which included American banks. The underwriters, attorneys, and accountants who were working on the offering met in the United States, and made preparations for the writing of prospectuses, which contained allegedly false information. All of the offerees resided outside of the United States, although some of them were American nationals. The stock of the offering corporation was traded on American markets. Upon collapse of the corporation, plaintiff purchasers brought an action in the Southern District of New York alleging violations of both the 1933 and 1934 Acts.

The *Bersch* court concluded, *inter alia*, that mere preparatory actions to the dissemination of information that contained materially misleading statements, which actions took place in this country, were not sufficient in that case to justify extension of the anti-fraud provisions of the securities laws, when the injured parties were foreign nationals, 519 F.2d at 992. It fur-

ther concluded that the adverse effect of the collapse of the offeror corporation on American stock markets was not sufficient to vest the district court with subject matter jurisdiction, *id.* at 988. The court recognized, however, that when American residents were injured by the transmission of materially false information into this country, the power of the district courts to entertain an action under the federal securities laws was invoked. It fashioned its holding on these issues in the following manner:

> We have thus concluded that the antifraud provisions of the federal securities laws:
>
> (1) Apply to losses from sales of securities to Americans resident in the United States whether or not acts (or culpable failures to act) of material importance occurred in this country; and
>
> (2) Apply to losses from sales of securities to Americans resident abroad if, but only if, acts (or culpable failures to act) of material importance in the United States have significantly contributed thereto; but
>
> (3) Do not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses.

*Id.* at 993.

■ Given this statement, the facts of this case, (particularly the transmission into this country of the letter containing the offer to sell shares to plaintiff), come squarely within the holdings of both the *Leasco* and *Bersch* cases that fraudulent information sent into this country from abroad and relied upon by American investors to their detriment constitutes sufficient conduct to justify the exercise of this court's jurisdiction. *See also, Recaman v. Barish,* 408 F.Supp. 1189 (E.D.Pa.1975) (holding that subject matter jurisdiction did not exist in a transaction involving an investment trust organized under the laws of the Bahamas, and plaintiffs who were neither American residents nor citizens, but

reasoning that a principal test for determining the existence of subject matter jurisdiction was whether or not the subject transaction had an impact on domestic investors or domestic securities markets). The court therefore holds that the transmission of the letter to Ann Arbor was in and of itself a sufficient act to create subject matter jurisdiction over the federal claims in this case.

### *Does a Cause of Action in Favor of Plaintiff Exist?*

#### *The Purchaser/Seller Requirement Section 10(b)*

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, by their terms make unlawful certain manipulation or deceptive devices or contrivances "in connection with the purchase or sale" of securities. Defendants contend that plaintiff has failed to state a cause of action for violation of § 10(b) and Rule 10b–5 because he neither purchased nor sold securities in connection with the allegedly fraudulent non-disclosure of material information. The requirement that only purchasers or sellers have standing to sue under section 10(b) and Rule 10b–5 was established by the Court of Appeals for the Second Circuit in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and subsequently ratified by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Plaintiff concedes that he neither purchased nor sold securities in connection with the allegedly fraudulent offer, but argues that the *"Birnbaum* rule" does not apply to this case.

#### *Damages Claims*

With respect to his claims for damages, plaintiff contends that the holding of *Blue Chip Stamps* is limited to an action for damages brought by persons who were not holders of the offeror's securities prior to the allegedly fraudulent offer. He points

out that the *Blue Chip Stamps* opinion recognized three separate classes of potential plaintiffs who could be barred by the *Birnbaum* rule, described as follows:

> Three principal classes of potential plaintiffs are presently barred by the *Birnbaum* rule. First are potential purchasers of shares, either in a new offering or on the Nation's post-distribution trading markets, who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was. Second are actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material. Third are shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5. It has been held that shareholder members of the second and third of these classes may frequently be able to circumvent the *Birnbaum* limitation through bringing a derivative action on behalf of the corporate issuer if the latter is itself a purchaser or seller of securities.

421 U.S. at 737–38, 95 S.Ct. at 1926–27.

Although the Court did in fact acknowledge that persons who were shareholders of the issuer could circumvent the *Birnbaum* rule by bringing a derivative action on behalf of the offeror corporation, it specifically noted that such actions, including one that arose out of the *Birnbaum* case itself, are essentially matters of state law, *id.* at n. 9. Although the decision in *Blue Chip Stamps* could be narrowly construed to apply only to complete strangers to the transaction, i.e. persons who had no affiliation with the issuer either before or after the allegedly fraudulent offer, the Court specifically rejected the argument that shareholders of the issuer be entitled to maintain actions under § 10(b) when they failed to purchase in reliance on the fraudulent offer, whereas non-shareholders would not. This position was advanced by the S.E.C. in an *amici* brief to *Blue Chip Stamps,* and rejected by the Court as follows:

> The SEC, recognizing the necessity for limitations on nonpurchaser, nonseller plaintiffs in the absence of the *Birnbaum* rule, suggests two such limitations to mitigate the practical adverse effects flowing from abolition of the rule. First, it suggests requiring some corroborative evidence in addition to oral testimony tending to show that the investment decision of a plaintiff was affected by an omission or misrepresentation. Apparently ownership of stock or receipt of a prospectus or press release would be sufficient corroborative evidence in the view of the SEC to reach the jury. We do not believe that such a requirement would adequately respond to the concerns in part underlying the *Birnbaum* rule. Ownership of stock or receipt of a prospectus says little about whether a plaintiff's investment decision was affected by a violation of Rule 10b–5 or whether a decision was even made. Second, the SEC would limit the vicarious liability of corporate issuers to nonpurchasers and nonsellers to situations where the corporate issuer has been unjustly enriched by a violation. We have no occasion to pass upon the compatibility of this limitation with § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). We do not believe that this proposed limitation is relevant to the concerns underlying in part the *Birnbaum* rule as we have expressed them.

*Id.* at n. 10.

The holding in *Blue Chip Stamps* was predicated in part upon the Court's concerns that a contrary result would have worked an unmanageable expansion of the class of persons entitled to maintain the implied private cause of action recognized by the courts to arise under § 10(b). Specifically, the Court sought to preclude availability of this action to persons who would merely allege that they had failed to purchase securities in reliance upon an ad-

vertisement placed by the offeror in a newspaper, which advertisement later proved to be erroneous, 421 U.S. at 746, 95 S.Ct. at 1930. The Court adverted at length to the proof problems that would arise in such action, where the principal issue, (whether or not the plaintiff relied to his detriment on something he had read in deciding not to purchase stock) involved a mental phenomenon, the existence or non-existence of which would have to be determined by the trier of fact entirely on the basis of the oral testimony of the plaintiff, *id.* at 743, 95 S.Ct. at 1929. The trial court would be faced with the additional problem of determining how many shares the plaintiff would have purchased had he not been mislead, and when he would have purchased them, in order to calculate damages in such a case.

▉ In this case, on the other hand, there is no dispute that plaintff was offered a fixed amount of shares on a specific date. The transaction is sufficiently documented to eliminate a number of the proof problems identified in *Blue Chip Stamps*. This court would still be required to ascertain the accuracy of plaintiff's representation that, but for the failure of the defendant to disclose materially important information, he would have purchased the new shares of JMA. This is the kind of "mental fact" which the *Blue Chip Stamps* court sought to preclude as a basis for liability under § 10(b). This court concludes that *Blue Chip Stamps* has erected a barrier to the maintenance of an action for damages under § 10(b) in a case such as this in which the plaintiff fails to purchase or sell securities in connection with the allegedly fraudulent transaction. This is true regardless of whether or not the plaintiff was a shareholder prior to the allegedly fraudulent offer, and regardless of the documentation of the offer and plaintiff's response to that offer. It is conceded by the parties that there was no sale or purchase of any securities in this case.

### The Claim for Injunctive Relief

Plaintiff points out that the *Blue Chip Stamps* did not address the application of

the *Birnbaum* rule to an action for equitable relief, and that post-*Blue Chip Stamps* cases have concluded that the exception to the *Birnbaum* rule for equitable actions brought under § 10(b) survives the Court's decision in *Blue Chip Stamps, see, e.g., Tully v. Mott Supermarkets,* 540 F.2d 187 (3rd Cir.1976); *Warner Communications v. Murdoch,* 581 F.Supp. 1482 (D.Del.1984); *Hundahl v. United Benefit Life Ins. Co.,* 465 F.Supp. 1349 (N.D.Texas 1979). *But see W.A. Krueger Co. v. Kirkpatrick, Pettis, Smith, Polian, Inc.,* 466 F.Supp. 800, 805 (D.Neb.1979) (holding that the *Birnbaum* rule applies to actions for injunctive relief).

The *Tully* case and the pre-*Blue Chip Stamps* cases that adopted similar reasoning indicate that the equitable exemption from the *Birnbaum* rule applies only when plaintiff seeks "prophylactic relief", i.e. a prohibition against future violation of the securities laws, *see, e.g. James v. Gerber Products,* 483 F.2d 944, 947 (6th Cir.1973) *Kahan v. Rosenstiel,* 424 F.2d 161 (3rd Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Mutual Shares Corp. v. Genesco, Inc.,* 384 F.2d 540 (2d Cir.1967).

▉ There is some uncertainty on the present record whether or not the new JMA shares have in fact been transferred by the corporation. Plaintiff argues that, assuming that the shares have not yet been transferred, this court has authority under the line of cases cited above to enjoin future transfer, which would constitute a prospective violation of the anti-fraud provisions of the securities laws. Such a position misconstrues the conduct that is prohibited in those provisions. As the discussion *infra* more fully explains, the issuance of the new shares of JMA, even with the avowed intent to dilute plaintiff's interest in the company and reduce the absolute value of that interest, does not violate any of the plaintiff's rights created by the anti-fraud provisions under which he has brought this action. The violation of federal law, if any, is the alleged failure to provide plaintiff with material information concerning the offer. Plaintiff has not requested as part of his prayer for relief that

defendants provide him with the information, absence of which made the offer allegedly misleading. Thus, plaintiff does not complain that there is a continuing violation of the anti-fraud provisions arising from the defendants' failure to release material information. Had he requested injunctive relief in the form of full disclosure of such information, his request would arguably have come within the exception to the *Birnbaum* -rule described by the *Tully* court.[6] Because plaintiff seeks to prevent a transaction, the sale of shares of stock to third parties [7], for which there is no predicate fraudulent activity, as that term has been construed by the courts, he is not entitled to injunctive relief under § 10(b).

### The 1933 Act Claims

Although there is substantial overlap between the kinds of conduct that is prohibited by § 10(b) of the 1934 Act and §§ 12(2) and 17 [8] of the 1933 Act, the language of the three provisions is not isomorphic. It is of course the statutory language that is the primary guide in delineating the scope of the prohibition that the statute prescribes.

Section 12(2), unlike § 10(b) prohibits the use of untrue statements or the failure to state a material fact by anyone who *"offers* or sells a security"* (emphasis added). Thus, the former provision applies to a broader range of conduct, and specifically regulates offers of sale as well as consummated sales. The court concludes that the purchaser/seller requirement is inapplicable to an action brought under § 12(2).

The language of § 17(a) is also dispositive of whether or not a purchase and sale

---

**6.** *Tully* dealt with a somewhat different problem than that involved in the instant case. In *Tully,* plaintiffs claimed that they had been injured by fraudulent statements that were used to oust them of control through the creation of a new class of stock, which was sold to defendants in violation of an agreement ratified by the board of directors. The court concluded that, because the plaintiffs neither purchased nor sold any of the shares from the newly created class of stock, they were not entitled to maintain an action for equitable relief. The court reasoned that the exception to the *Birnbaum* rule for equitable actions did not apply in a case such as this where the plaintiffs sought to unwind a transaction already completed, rather than enjoin future violations of the anti-fraud provisions, 540 F.2d at 195.

In this case, on the other hand, the present record is unclear as to whether the newly created shares have been transferred from JMA, although the defendants have been under an order of this court, entered pursuant to an oral stipulation by the parties, to restrain from such a transfer pending the resolution of these motions. Assuming for the sake of argument that the challenged transaction in this case has not been completed, and the court were able to satisfy the plaintiff with an order limited to prospective relief only, it still concludes that plaintiff does not have standing to maintain this part of his action. Plaintiff has no cause of action for transfer of the new shares to other parties, because there is no allegation that such transfers would be accomplished with the aid of fraudulent statements or material omissions. Only the failure of the defendants to make a complete disclosure to plaintiff is actionable under the anti-fraud provisions of the federal securities laws.

**7.** Plaintiff does not allege that potential third party transferees of the shares were or will be mislead by the defendants. The court does not address the obvious question of plaintiff's standing to raise such a claim were it present in this case.

**8.** The court recognizes that there is a sharp division among the courts of appeal as to the existence of an implied private cause of action under § 17, *compare Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 815 (9th Cir.1981) (private cause of action exists under § 17) *with Shull v. Dain, Kalman & Quail, Inc.,* 561 F.2d 152, 159 (8th Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) (no private right of action under that provision). This question has not yet been answered by the Court of Appeals in this circuit.

Although the scope of the various prohibitions created by § 17 may be no broader than that erected by § 10(b), plaintiff may derive a very real benefit from the purported existence of an implied right of action under § 17(a)(1). The court concludes, *infra,* that plaintiff need not establish that he was a purchaser or seller of securities to proceed under that provision, as he is required to do with respect to his § 10(b) claim.

Because defendants have provided the court with no compelling argument for dismissal of the § 17(a)(1) claim in these motions, the court concludes that it is not entitled to the relief requested and denies the motion with respect to that claim at this time.

is a predicate to maintaining a cause of action under that provision.

The Supreme Court has recently recognized that the three paragraphs of § 17(a) do not admit of uniform treatment. In *Aaron v. S.E.C.*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the Court concluded that the S.E.C. was required to prove *scienter*, an intentional act of duplicity, in order to prevail in an enforcement action brought under § 17(a)(1), but need not prove *scienter* in actions brought under subdivisions (a)(2) or (3), *id.* at 697. The Court came to this detailed holding from a careful reading of the statutory language.

Each of the paragraphs are designed to prohibit what might broadly be described as fraudulent conduct in the trading of securities, but each is characterized by distinctive language. In particular, paragraphs (a)(2) and (a)(3) incorporate the purchase and sale requirement by implication, if not by express statement. Paragraph (a)(2) prohibits the use of untrue statements or the failure to state a material fact "to obtain money or property", which obviously contemplates a consummated contract of exchange. Paragraph (a)(3) prohibits "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the *purchaser*" (emphasis added), again describing a completed transaction involving a security.

■ Paragraph (a)(1), by contrast, contains no such reference to a completed transaction, but merely prohibits the use of "any device, scheme, or artifice to defraud" in the offer or sale of any securities. Thus, the court concludes that a person in the position of plaintiff herein who alleges that defendants failed to provide him with material information in connection with an offer to sell securities is not precluded from maintaining a private action under either § 17(a)(1), or § 12(2) of the 1933 Act because that offer was not consummated by an acceptance and sale.

### The Requirement of "Fraud"

There is an additional reason why certain of plaintiff's claims for legal and equitable relief under the federal securities laws are infirm. In *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court concluded that plaintiff minority shareholders failed to state a claim under § 10(b) when their shares were involuntarily converted pursuant to Delaware's "short-form merger" statute. The Court concluded that the plaintiffs had been adequately notified of the merger, pursuant to the requirements of the statute, and had in no way been misled, either by any affirmative misrepresentations or failures to disclose material facts.

The plaintiff disputes the application of *Santa Fe* to the facts of this case. He urges that the opinion be narrowly construed to bar an action under the federal anti-fraud laws only when the person seeking relief has a statutorily mandated procedure for evaluating securities lost through a statutorily created merger mechanism. He contends that the conduct of the defendants in this case, which is condemned by local corporate law, should not be insulated against liability under the federal securities laws as was the conduct at issue in *Santa Fe*, which was expressly authorized by Delaware law, was found to be.

In a broader sense, plaintiff argues that the anti-fraud provisions of the federal securities laws extend beyond the marketplace and "into the boardroom" to regulate a broad spectrum of corporate conduct that might affect the value of the company's stock. Support for such a statement can indeed be found in a number of cases cited by the plaintiff, *see, e.g. Herpich v. Wallace*, 430 F.2d 792, 802 (5th Cir.1970) (securities laws devised to prevent inequitable and unfair practices for insuring fairness and honesty in securities transactions generally); *Ruckle v. Roto American Corporation*, 339 F.2d 24 (2d Cir.1964) (creation of new shares for the purpose of maintaining control by current board of directors stated a claim under § 10(b)).

It is noteworthy, however, that none of the cases relied upon by plaintiff, even

those that indicate that the securities acts can be used to attack the "fairness" of a particular transaction in securities, (by which the courts typically mean the price at for which the defendants are willing to pay for a controlling interest in the corporation) have held that a failure to allege either a material misstatement of fact or a failure to disclose material information is not fatal to stating a claim under § 10(b). Indeed, the *Ruckle* court indicated that the requirement of proving deception in the communication of information was a predicate to such a cause of action:

> It may be that there was no concealment of material facts at the board of directors meeting at which the transactions were approved. But, there are matters which, of course, go to the merits of the case and not to the jurisdiction of the court.

*Id.* at 29.

In another case relied upon by plaintiff, *Popkin v. Bishop*, 464 F.2d 714 (2d Cir. 1972), the court concluded that plaintiff had failed to state a claim by alleging that defendant had manipulated exchange rates in a merger by which it sought to retain a disproportionate share of the merged corporations' assets. The *Popkin* court stated that:

> [O]ur emphasis on improper self-dealing did not eliminate non-disclosure as a key issue in Rule 10b–5 cases. Section 10(b) of the Exchange Act and Rule 10b–5 are designed principally to impose a duty to disclose and inform rather than to become enmeshed in passing judgments on information elicited. This design has special relevance to merger transactions that, under state law, must be subjected to shareholder approval. In the context of such transactions, if federal law ensures that shareholder approval is fairly sought and freely given, the principal federal interest is at an end. Underlying questions of the wisdom of such transactions or even their fairness become tangential at best to federal regulation. And when what is sought is injunctive relief, a federal court of equity should regard this consideration as controlling. Thus, in the present case, we believe that once appellant admitted that defendants fully and fairly disclosed all material facts surrounding the merger to all interested parties, including the minority shareholders, appellant's claim under Rule 10b–5 for injunctive relief must fall.

*Id.* at 719–20, (citations omitted).

Any uncertainty on the question of whether or not § 10(b) was intended to regulate the substantive fairness of a transaction in securities appears to have been resolved in the negative by *Santa Fe.* The language of the opinion so indicates:

> It is our judgment that the transaction, if carried out as alleged in the complaint, was neither deceptive nor manipulative and therefore did not violate either § 10(b) of the Act or Rule 10b–5.

> As we have indicated, the case comes to us on the premise that the complaint failed to allege a material misrepresentation or material failure to disclose. The finding of the District Court, undisturbed by the Court of Appeals, was that there was no "omission" or "misstatement" in the information statement accompanying the notice of merger. On the basis of the information provided, minority shareholders could either accept the price offered or reject it and seek an appraisal in the Delaware Court of Chancery. Their choice was fairly presented, and they were furnished with all relevant information on which to base their decision.

> We therefore find inapposite the cases relied upon by respondents and the court below, in which the breaches of fiduciary duty held violative of Rule 10b–5 included some element of deception. Those cases forcefully reflect the principle that "[§]10(b) must be read flexibly, not technically and restrictively" and that the statute provides a cause of action for any plaintiff who "suffer[s] an injury as a result of deceptive practices touching its sale [or purchase] of securities...." *But the cases do not support the proposition, adopted by the Court of Appeals*

*below and urged by respondents here, that a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure, violates the statute and the Rule.*

It is also readily apparent that the conduct alleged in the complaint was not "manipulative" within the meaning of the statute. "Manipulation" is "virtually a term of art when used in connection with securities markets." The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity. (Rule 10b–6, also promulgated under § 10(b), is "an antimanipulative provision designed to protect the orderliness of the securities market during distributions of stock" and "to prevent stimulative trading by an issuer in its own securities in order to create an unnatural and unwarranted appearance of market activity"). Section 10(b)'s general prohibition of practices deemed by the SEC to be "manipulative"—in this technical sense of artificially affecting market activity in order to mislead investors—is fully consistent with the fundamental purpose of the 1934 Act " 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* ....' " Indeed, nondisclosure is usually essential to the success of a manipulative scheme. No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. *But we do not think it would have chosen this "term of art" if it had meant to bring within the scope of § 10(b) instances of corporation mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary.*

430 U.S. at 474–77, 97 S.Ct. at 1301–03 (citations omitted) (emphasis added).

■ The court concludes that plaintiff's allegations, insofar as they fail to allege a material misstatement or a failure to disclose material information, fail to state a cause of action under either §§ 12(2) or 17 of the Securities Act. Section 12(2) contains an express requirement of proof of fraud.

■ As discussed above, plaintiff is precluded from maintaining an action under paragraphs (a)(2) and (a)(3) of § 17 because he is neither a purchaser nor a seller of securities. The language of paragraph (a)(1) is similar, if not identical to the prohibition contained in § 10(b) against "any manipulative or deceptive device or contrivance". Indeed, the language of the latter provision might be construed to create a broader prohibition than that of the former, under which the "device" must have the purpose to defraud. Plaintiff contends that the scheme to divest him of his controlling interest in JMA was indeed such a scheme to defraud. The court finds this characterization overly broad. At least one commentator has opined that the securities laws intended to incorporate the common law of fraud, *see* 3 Loss, *Securities Regulation*, p. 1430 (1961).

A hallmark of common-law fraud has always been the knowing statement of a purported fact which the speaker knows at the time of the statement to be false, *see* 37 Am.Jur.2d, *Fraud and Deceit*, § 12 at n. 10 (1968). Congressional grafting of the common-law features of fraud onto the federal securities laws, coupled with the *Santa Fe* Court's conclusion that a misstatement or failure to disclose a material fact is essential to a cause of action under § 10(b), leads this court to conclude that a similar requirement be imposed under § 17(a)(1) and § 12(2). For that reason, plaintiff's allegations that the issuance of the new shares to other persons will result in a reduction of the value of his own shares, and a diminution in his interest in the company, fail to state a cause of action under either provision.

Review of this cluttered landscape of statutory construction after the dust has settled reveals that plaintiff is able to maintain under the federal securities law only those claims that he was misled by the failure of defendants to provide him with full disclosure of material information in

connection with the offer to purchase new shares. Further, those claims are cognizable in this action only under §§ 12(2) and 17(a)(1) of the 1933 Act, which do not require a purchase or sale as an element of the implied private cause of action.

### The Pendent Claims

Defendants have attacked the pendent claims of this complaint on the presumption that all federal claims are infirm, concluding that the pendent claims should be dismissed as having no independent jurisdictional basis. As the court indicated in its order of October 12, diversity jurisdiction over the Michigan and Bermuda-based claims exists in this case even if plaintiff had failed to assert any viable claims that would implicate the federal question jurisdiction of this court. Further, as the foregoing analysis indicates, defendants have not demonstrated that all of plaintiff's federal claims are infirm as a matter of law at this time. Consequently, defendants' motion to dismiss the pendent claims is denied.

### The Pending Injunction

This court entered a preliminary injunction against any trading of JMA Stock on July 5, without opposition from the defendants, pending resolution of these motions. The court now concludes that, although plaintiff is entitled to proceed with certain of his claims at this juncture in the proceedings, he has not demonstrated a reasonable likelihood of success on the merits, nor the kind of irreparable harm that would entitle him to a continuation of the preliminary injunction over the objection of the defendants. The preliminary injunction is therefore dissolved.

### SUMMARY

To conclude, the motions of defendants Palmer, Murch, Francis, Richards, and Ardon Management Services, Ltd., to dismiss the claims against them for want of *in personam* jurisdiction is granted. The motions of defendants JMA, Martin, and Carter to dismiss the claims arising under § 10(b) of the Securities Exchange Act, and § 17(a)(2) and (a)(3) of the Securities Act are granted for failure to state a claim upon which relief can be granted. The motions of those defendants are also granted with respect to plaintiff's claims under §§ 12(2) and 17(a)(1) of the Securities Act, insofar as those claims are predicated upon allegations other than defendants' failure to disclose material information in connection with their offer to sell shares to plaintiff. All other motions are denied at this time.

SO ORDERED.